[No. C017880. Third Dist. July 28, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
BILLY JOE JEFFERY, JR., Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*See footnote 1, *post*, page 212.

COUNSEL

Brace & Crowdis and Danny D. Brace, Jr., for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Willliamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Cynthia G. Besemer and Dawn T. Bladet, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

DAVIS, J.—A jury convicted defendant Billy Joe Jeffery, Jr., of manufacture of methamphetamine (Health & Saf. Code, § 11379.6), possession of methamphetamine for sale (Health & Saf. Code, § 11378), and five counts of sale of methamphetamine (Health & Saf. Code, § 11379). In a bifurcated trial, the court found defendant possessed in excess of three pounds of methamphetamine for sale. (Health & Saf. Code, § 11370.4.) Defendant was sentenced to an aggregate five-year prison term.

In the published portion of the opinion we reject defendant's contentions that (1) the court erred in admitting codefendant James Bateman's statements to Sheriff's Officer Gerald Ward under the coconspirator's exception to the hearsay rule, and (2) the court erred in failing to instruct the jury sua sponte that extrajudicial statements by coconspirator Bateman must be corroborated. (CALJIC No. 3.11)

In the unpublished portion of the opinion we reject defendant's assertions that (1) the court erred in failing to sever his trial from codefendant Bateman's trial, (2) Ward did not accurately testify to Bateman's statements, (3) the court improperly denied defendant's motion for acquittal based on insufficiency of the evidence, (4) the court erred in denying his motion for a new trial, and (5) the court improperly denied probation and sentenced defendant to the middle prison term for manufacturing methamphetamine. Accordingly, we shall affirm the judgment in its entirety.[1]

THE FACTS

On November 24, 1992, Ward, acting undercover, ordered two ounces of methamphetamine at $700 per ounce from Bateman at his business, Bateman's Auto Wrecking. At the business on the following day, Bateman gave Ward a baggie containing methamphetamine in exchange for $1,400.

---

[1]The Reporter of Decisions is directed to publish this opinion with the exception of parts III, IV, V, VI, and VII of the Discussion.

During this transaction, Bateman asked where Ward "had been getting this stuff before." Ward responded he bought from a mutual acquaintance with whom he traded chemicals like ephedrine, a precursor chemical necessary to produce methamphetamine, for methamphetamine. After Bateman asked Ward if he could obtain ephedrine and Ward said yes, Bateman volunteered he knew "a kid in Oroville" who could make ephedrine into methamphetamine.[2]

Ward bought a second baggie of methamphetamine from Bateman at his business in exchange for $1,400 and a half ounce of ephedrine on December 4, 1992. After Bateman asked if Ward could get additional quantities of ephedrine, Ward agreed to hold five pounds of ephedrine at Bateman's request to give Bateman an opportunity to speak with the cook in Oroville. Bateman explained he was paying too much where he was presently getting his methamphetamine and thought he could increase his profit if he went into business with someone at the manufacturing end.

On December 11, 1992, Bateman and Ward met at the Pizza Mill restaurant and agreed that Ward would give Bateman the five pounds of ephedrine in exchange for four ounces of methamphetamine made from phenyl-2-propanol and three ounces of methamphetamine made from Ward's ephedrine. When Ward asked Bateman if his partner would agree to this arrangement, Bateman said yes. Bateman told Ward he was not working with the kid from Oroville. Instead, "he was going to be dealing with the same person he had been dealing with for a long time," someone he "had been doing this stuff with for years." Without giving a name, Bateman added this person could "cook both ways," meaning he could manufacture methamphetamine using either phenyl-2-propanol or ephedrine.

During the same conversation, Bateman later mentioned the name "Bill," which Ward understood as a reference to the cook. Bateman told Ward that Bill and his wife had been arrested for spousal abuse earlier that morning around 8 or 9 in Rio Linda after they struck each other with a telephone and were being held on $25,000 bail each. While Bateman had money belonging to Bill, Bateman did not know if Bill wanted Bateman to post it as bail.[3] Bateman mentioned that Bill was cooking for a man named Duane, but Duane would not be involved in this deal.[4] He also told Ward that Bill liked the sample of ephedrine already provided. To confirm his understanding, Ward asked Bateman if Bill was the cook, and Bateman nodded affirmatively.

---

[2] During all face-to-face encounters with Bateman, Ward wore a body wire which allowed their conversations to be overheard by other officers and recorded.

[3] Defendant later admitted part of his bail was posted by Bateman.

[4] In the record, Duane is sometimes referred to as Arnold. Defendant testified Duane's complete name is Arnold Duane Daniel.

On December 11, 1992, defendant and his wife, Carlene, were arrested in Rio Linda for mutual spousal abuse involving a telephone receiver and were held on $25,000 bail.

On December 12, 1992, Ward and Bateman exchanged five pounds of ephedrine for four ounces of methamphetamine.

On December 28, 1992, Ward received three ounces of methamphetamine from Bateman near his home. Bateman commented that Bill really liked the ephedrine, noting it cooked really well with a minimal cooking loss. Ward and Bateman agreed to exchange 20 pounds of ephedrine for 1 pound of methamphetamine.

On December 30, 1992, Ward and Bateman exchanged 20 pounds of ephedrine for 1 pound of methamphetamine in a parking lot near a McDonald's restaurant. Thinking Bateman would lead them to the methamphetamine laboratory, officers followed Bateman to a business in Sacramento and the residence of a Mike Todd in Rio Linda before taking Bateman into custody. When arrested, the officers found the 20 pounds of ephedrine in Bateman's car and an electronic telephone directory on his person containing defendant's name, among others.

After procuring search warrants or consent, officers searched Bateman's home and business, defendant's home, motor home and boat, and Mike Todd's residence. The officers found 5.7 grams of methamphetamine in Bateman's freezer and a bindle containing .4 grams of methamphetamine in Bateman's bathroom. The officers found no evidence of a methamphetamine laboratory.

While the officers searched Bateman's business on the day of his arrest, defendant arrived in a Corvette registered to Duane Daniel. Another man, Charles Silva, also arrived during the search, driving defendant's truck. A search of defendant's truck revealed a briefcase containing a receipt for a cashier's check from defendant to Chemicals for Research and Industry in the amount of $2,450 to purchase five gallons of hydriodic acid on September 8, 1992.

The defense called two witnesses. Charles Silva testified he knew defendant for two or three years. Silva, who works in automotive repair and towing, had defendant's truck on December 30 to make some repairs and drove it to the wrecking yard because he needed to transport some parts. With Daniel's knowledge, defendant picked up Daniel's Corvette from Silva when defendant left his truck for repairs.

Defendant testified he purchased hydriodic acid for Daniel because Daniel did not have two forms of identification and because he offered to pay defendant $500. He arrived at the wrecking yard on December 30 to buy some parts for Daniel and did not know Silva would be there. Codefendant Bateman did not testify.

## DISCUSSION

## I

At a pretrial hearing, the trial court found the prosecution made a prima facie showing that Bateman's statements to Ward were admissible under the coconspirator's exception to the hearsay rule. On appeal, defendant asserts the evidence did not independently establish a conspiracy or establish his participation in a conspiracy on December 11, 1992. Defendant further asserts Bateman's statements that defendant had been arrested for spousal abuse were not in furtherance of the conspiracy. We disagree.

"Hearsay evidence is of course generally inadmissible. Hearsay statements by coconspirators, however, may nevertheless be admitted against a party if, at the threshold, the offering party presents 'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' [Citations.] Once independent proof of a conspiracy has been shown, three preliminary facts must be established: '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.'" (*People* v. *Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781]; Evid. Code, § 1223.)

"Only prima facie evidence of a conspiracy is required to permit the trial court to admit evidence under the coconspirator's exception. This fact need not be established beyond a reasonable doubt, or even by a preponderance of the evidence. . . . The conspiracy may be shown by circumstantial evidence and 'the agreement may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute.'" (*People* v. *Olivencia* (1988) 204 Cal.App.3d 1391, 1402-1403 [251 Cal.Rptr. 880], citations omitted.)

According to an agreed-upon statement presented by the prosecutor and defendant's counsel at the pretrial hearing, defendant arrived at Bateman's business, the place where two of the drug sales had occurred, on the day

Bateman received the twenty pounds of ephedrine. From defendant's fortuitous appearance, the trier of fact could reasonably infer defendant intended to retrieve the ephedrine from Bateman and convert it to methamphetamine. The September 8, 1992, receipt for $2,450 worth of hydriodic acid, a chemical necessary to produce methamphetamine from ephedrine, suggested the duration of the conspiracy. Finally, the arrest of defendant and his wife for spousal abuse on December 11, 1992, confirmed defendant's identity as the "Bill" to whom Bateman referred. Sufficient evidence independently established a prima facie case of a conspiracy between Bateman and defendant to manufacture and sell methamphetamine.

Defendant's complaint that Bateman's statements regarding defendant's arrest for spousal abuse were not in furtherance of the conspiracy is also mistaken. These statements were made in furtherance of the conspiracy. According to the agreed-upon statement of facts, Bateman explained to Ward that he could not deliver the ephedrine-based methamphetamine for two to four weeks because Bill and his wife were arrested that morning for spousal abuse and were being held on $25,000 bail each. Bateman added that he did not know whether Bill wanted to sit in jail and await release on his own recognizance or whether he wanted to be bailed out right away and lose $2,500. The context of Bateman's statement suggests he was trying to explain a potential delay in the methamphetamine manufacture. Defendant argues Bateman's revelation could not have reassured Ward and therefore could not be in furtherance of the conspiracy. However, the trier of fact could reasonably infer Bateman was attempting to forestall Ward's ire when the methamphetamine was not immediately available by explaining this difficulty at the outset.

## II

Defendant next asserts that because the coconspirator, Bateman's, statements to Ward were admitted for the truth of the matter asserted, the court erred in failing to give CALJIC No. 3.11, sua sponte. We find the trial court had no such duty.

CALJIC No. 3.11 provides in part: "A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense. [¶] [Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated was true.]" For the reasons set forth in the remainder of our discussion, the quoted bracketed language is mistaken when it asserts that testimony includes "*any* out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated was true." (Italics added.)

CALJIC No. 3.11 derives from Penal Code section 1111, which provides in pertinent part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense[.]"

Penal Code section 1111, by its terms, only applies to "testimony." " 'Testimony' is generally described in both statutory and decisional law as oral statements made by a person under oath in a court proceeding." (*People v. Belton* (1979) 23 Cal.3d 516, 524 [153 Cal.Rptr. 195, 591 P.2d 485].) Thus, unsworn out-of-court statements ordinarily do not constitute "testimony." As Justice Jefferson noted in *People v. Pic'l* (1981) 114 Cal.App.3d 824, 873-874 [171 Cal.Rptr. 106] (reversed on other grounds in *People v. Pic'l* (1982) 31 Cal.3d 731 [183 Cal.Rptr. 685, 646 P.2d 847]; disapproved on other grounds in *People v. Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803]), "[t]he only departure from this generally accepted concept that 'testimony' is limited to in-court statements given under oath by a *witness* in a court proceeding is found in the *Belton* case. In *Belton,* the court extended the concept of 'testimony' within the meaning of Penal Code section 1111 to cover the prior inconsistent statements of a witness, admissible under the prior-inconsistent-statement exception to the hearsay rule."

In *Belton,* the defendant was convicted of discharging a firearm at an inhabited dwelling after he drove his stepson by the house at which the stepson fired a shotgun. (23 Cal.3d at pp. 518, 519.) After the stepson testified at trial that neither he nor the defendant was involved in the shooting, the prosecutor introduced the stepson's admissions to a police officer that he fired the shotgun at the house after having the defendant drive him there. (*Id.* at p. 519.) On appeal, the defendant asserted the evidence was insufficient to support his conviction because the only testimony tying him to the offense was the uncorroborated extrajudicial statements of his stepson, an accomplice. (*Id.* at p. 519-520.)

Reversing the defendant's conviction, the court first noted, " 'The rationale for requiring corroboration of an accomplice is that the hope of immunity or clemency in return for testimony which would help to convict another makes the accomplice's testimony suspect, or the accomplice might have many other self-serving motives, that could influence his credibility.' " (23 Cal.3d at p. 525, quoting *People v. Marshall* (1969) 273 Cal.App.2d 423, 427 [78 Cal.Rptr. 16].) From this, the court concluded, "In enacting section 1111, the Legislature intended to eliminate the danger of a defendant being convicted solely upon the suspect, untrustworthy and unreliable evidence coming from an accomplice, who is likely to have self-serving motives that

affect his credibility. If an accomplice's testimony under oath is suspect, unreliable and untrustworthy, evidence of his prior inconsistent statements, not made under oath or in the presence of the trier of fact, must be deemed even more suspect, untrustworthy and unreliable." (23 Cal.3d at p. 526.) Accordingly, ". . . applying the basic principle that legislative intent prevails over literal construction, this court concludes that [the accomplice's] prior inconsistent statement constituted 'testimony,' as the term is used in section 1111." (*Ibid.*)

From *Belton*, we conclude that "testimony" within the meaning of Penal Code section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police. These circumstances are most likely to induce self-serving motives and hence untrustworthy and unreliable evidence. Thus, in *Belton*, the statement in question came when the accomplice was questioned by a deputy sheriff about the crime. Similarly, in *People* v. *Andrews* (1989) 49 Cal.3d 200, 206-207 [260 Cal.Rptr. 583, 776 P.2d 285], the accomplice gave written and tape-recorded statements to the police just after his arrest.

On the other hand, when the out-of-court statements are not given under suspect circumstances, those statements do not qualify as "testimony" and hence need not be corroborated under Penal Code section 1111. Thus, in *People* v. *Sully* (1991) 53 Cal.3d 1195, 1230 [283 Cal.Rptr. 144, 812 P.2d 163], the high court, citing *Pic'l*, held that out-of-court statements given under circumstances which fall within the spontaneous statement exception to the hearsay rule are not given in suspect circumstances and hence do not constitute testimony for purposes of the statute.

No one disputes Bateman's status as an accomplice or that his extrajudicial statements were admitted at trial for the truth of the matter asserted. However, unlike in *Belton*, Bateman's statements were neither suspect, untrustworthy nor unreliable. Bateman's statements to Ward were made in the course of the methamphetamine sales and without Bateman's knowledge that Ward was an undercover police officer. Thus, they are not "testimony" within the meaning of Penal Code section 1111 and need not be corroborated. Instruction pursuant to CALJIC No. 3.11 was not warranted. Moreover, even had the instruction been required, its absence would have been harmless since the evidence set forth in part I of this discussion provided sufficient corroboration.

III-VII*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Sparks, Acting P. J., and Scotland, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 2, 1995.

---

*See footnote 1, *ante*, page 212.