Filed 1/23/14  P. v. Sherman CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ELISA BERTHA SHERMAN,<br><br>    Defendant and Appellant. | 2d Crim. No. B247091<br>(Super. Ct. No. 2011043698)<br>(Ventura County) |

Elisa Bertha Sherman appeals a judgment following her conviction for possession for sale of a controlled substance--methamphetamine (Health & Saf. Code, § 11378) and transportation of methamphetamine (*id.*, § 11379, subd. (a)).  We conclude, among other things, that 1) the trial court did not err by admitting evidence of Sherman's prior convictions; 2) the trial court gave proper guidance to jurors about audio recordings of conversations that were admitted into evidence and a written transcript that contained English translations of Spanish language conversations; and 3) the trial court should have given a sua sponte instruction on an uncharged conspiracy, but the error was harmless. We affirm.

FACTS

On December 13, 2011, Sheriff Detective Peter Frank met with a confidential informant (CI) to conduct an investigation of Sherman who was "suspected

of dealing methamphetamine." The CI had been arrested for selling methamphetamine and was "working off a criminal case" by cooperating with police.

Frank had the CI send a text message to Sherman's telephone. The message was, "I need two balls. My truck messed up." The CI and Sherman had prior transactions involving methamphetamine. Frank testified the message meant the CI was requesting two "eight balls" of methamphetamine, each ball would weigh 3.5 grams, and the CI could not travel.

Seven minutes later the CI received a text response stating, "I need cash from last time but I have one, and I'll get you the other one afterwards. What should we do?" The CI told Frank that he owed money to Sherman from a prior occasion when he purchased drugs from her. Sherman sent another text message asking the CI, "How much cash do you have right now and I'll go down there real quick." She sent another text asking, "Where are you? At home or shop?" The CI and Sherman agreed to meet at the shop, a "vacuum-repair" business in Simi Valley.

Frank had the CI make a telephone call to Sherman's phone number. Francisco Diaz answered. Sherman was speaking in the background, telling Diaz to advise the CI that they had a car. Diaz was Sherman's boyfriend. The CI told Diaz that he wanted "seven" and he had "four." The call ended because the telephone's battery "died." Frank testified "seven" meant "two 3.5-gram eight balls" and "four" meant $400.

The CI made a second call. Diaz answered and told the CI that Sherman wanted to know if he had the money. The CI responded, " Yeah . . . I've got at least four hundred." Diaz: "Okay. Yeah, we'll be over there right now." CI: "Well, I can't, I'm with my sister right now. But, um, I'll be at the shop in about 45 minutes." Diaz responded, "All right, for sure." Some of the remaining conversation was in Spanish. Jurors received an English translation of the Spanish portions of this call.

In a third telephone call, the CI told Diaz and Sherman that he would be at the shop in 15 minutes. In a fourth call, Sherman told the CI she would be at the shop in 25 minutes. These four telephone calls were played for the jury and jurors received

2

transcripts of these conversations. The first, third and fourth calls were entirely in English.

Frank testified that Sherman made the final call. At 9:00 p.m., Sherman arrived at the shop, made a telephone call to the CI, and said, "Hey. I'm here. I'm at the shop." The CI responded, "Okay. I'll be out in a few minutes."

Sherman was arrested at the shop. She was searched and officers found she possessed 3.4 grams of methamphetamine in a small black "bindle" which was hidden in her bra. Frank testified she possessed the amount of methamphetamine the CI ordered. Police found a scale in the car she arrived in. Frank testified such scales "are generally used by drug dealers when weighing out amounts to be sold." In the search of the vehicle, officers found Sherman's cell phone. The "user name" on the phone was "Elisa Sherman 05." It contained text messages that indicated Sherman had previously sold illegal drugs.

In the defense case, Sherman testified she did not sell methamphetamine to the CI. She had known the CI for a year and a half before she was arrested. The CI sold narcotics to her. Sherman needed "the meth" for her "personal use." The police found a glass pipe in her possession. She used it to smoke methamphetamine. She had a scale to weigh the drugs because the CI "was always short" on the drugs he agreed to deliver. Sherman said, "[A] lot of people used [her] phone."

On cross-examination, Sherman said she was convicted of possession for sale of cocaine in 2003. In 2001, she was convicted of assault with a deadly weapon. In 1996, she was convicted of possession for sale of marijuana.

## DISCUSSION

*Admission of Evidence about Prior Convictions*

Sherman contends the trial court erred by admitting evidence that she had a 1996 conviction for possession of marijuana for sale (Health & Saf. Code, § 11359), a 2001 conviction for assault with a deadly weapon (Pen. Code, § 245, subd. (a)), and a

3

2003 conviction for possession of cocaine base for sale (Health & Saf. Code, § 11351.5). We disagree.

The prosecution may not introduce evidence of prior convictions to show a defendant's propensity to commit crimes. But where defendants elect to testify, they place their credibility in issue. (*People v. Hinton* (2006) 37 Cal.4th 839, 888.)

The trial court ruled that the three convictions would be admissible if Sherman elected to testify. Sherman made that election and testified. The court said the evidence of these prior convictions could be considered for impeachment purposes. We review the trial court's admission of this evidence to determine whether the court abused its discretion. (*People v. Green* (1995) 34 Cal.App.4th 165, 182.)

Sherman contends the evidence of these convictions was inadmissible because it was "not probative of her honesty or veracity." (Boldface omitted.) Earlier cases had strictly limited the admissibility of prior convictions for impeachment. But our Supreme Court has held, "'[Proposition 8] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty.'" (*People v. Hinton*, *supra*, 37 Cal.4th at p. 888.) Sherman's conviction for assault with a deadly weapon involves "moral turpitude," and it is consequently "admissible for impeachment." (*Ibid.*)

Sherman's two prior convictions for possession of drugs for sale involved "a readiness to do evil" and "the intent to corrupt others." (*People v. Navarez* (1985) 169 Cal.App.3d 936, 949.) They also entail "moral turpitude" and may be considered for impeachment. (*Ibid.*) To exclude this evidence, as Sherman requests, would give her a "false aura of veracity." (*People v. Hinton*, *supra*, 37 Cal.4th at p. 888.) It would unfairly permit her to challenge the prosecution's witnesses, but to insulate her testimony from credibility challenges.

Sherman contends the three convictions were too remote in time to be admissible. The trial court considered this issue. The prosecution tried to introduce five prior convictions. But the court ruled that Sherman's 1986 and 1989 convictions were too remote and had to be excluded.

4

Sherman claims the trial court should have excluded the three convictions it admitted. The oldest of the three was a 1996 conviction for violating Health and Safety Code section 11359. Had that been Sherman's only conviction, her claim about excluding it would have had greater weight. But Sherman did not "lead a blameless life" after that conviction. (*People v. Green*, *supra*, 34 Cal.App.4th at p. 183.) She had subsequent convictions in 2001 and 2003. Consequently, her crimes created a pattern that was "relevant" to her "credibility." (*Ibid.*)

Sherman argues that admitting the two prior convictions for possession of drugs for sale was error because they were too similar to her current charged offenses. But "[p]rior convictions for the identical offense are not automatically excluded." (*People v. Green*, *supra*, 34 Cal.App.4th at p. 183.) In rejecting a claim similar to the one Sherman advances, the *Green* court said, "Since the admission of multiple identical prior convictions for impeachment is not precluded as a matter of law [citation], and a series of crimes may be more probative than a single crime, there was no abuse of discretion" for admitting the convictions. (*Ibid.*)

Sherman suggests admitting this evidence lessens the prosecution's burden. She says it could lead jurors to convict her because of what she did in the past, and ignore the evidence about the current charged offenses. But the trial court instructed jurors that evidence about other crimes could not be used to reduce the prosecution's burden on the charged offenses. It said, "The People must still prove every charge beyond a reasonable doubt." It told jurors they could only consider Sherman's prior convictions "for the purposes of deciding credibility." The jurors could not consider them to conclude she had "a propensity for selling drugs." We must presume the jury followed these instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 745.) Reasonable jurors would not interpret the court's instructions to permit them to ignore the evidence on the charged crimes and find Sherman guilty based on her past conduct. Sherman has not shown an abuse of discretion.

*Admitting Audio Tapes and a Transcript Containing Translations*

Sherman notes that the trial court admitted audio tapes of conversations involving her, Diaz and the CI, and transcripts of those tapes were provided to the jurors. She highlights the remarks by the trial court relating to the transcript of the first telephone call between the CI and Diaz. That conversation was entirely in English. The trial court said, "Transcripts are prepared in order to assist you with what you're hearing, but they are not evidence. It's not uncommon for there to be mistakes on transcripts. *So if you hear something different than what you're reading on the paper, you need to go with what you hear because the actual evidence is going to be the audio, not the transcript.*" (Italics added.)

Sherman points out that: 1) the second conversation was in both English and Spanish, and 2) the transcript contained English translations of the Spanish portions of that conversation. She argues there may have been bilingual jurors who heard one thing in Spanish, and nonbilingual jurors who relied on the written translation which was different. She claims the court's instructions were confusing and that it should have provided a jury instruction informing jurors to rely on the written transcript containing the translations of the Spanish conversations.

The People contend Sherman forfeited this claim by not raising these objections in the trial court. We agree. (Cf. *People v. Torres* (1985) 164 Cal.App.3d 266, 270 ["Defense counsel had the opportunity to challenge the accuracy of the translations . . . or obtain his own expert to translate the recording into the English language but failed to do so"].) But even on the merits, the result is the same.

Where a tape recording containing Spanish is admitted into evidence, the jurors should have an English language translation of the Spanish language on the tape. (*People v. Cabrera* (1991) 230 Cal.App.3d 300, 304.) "Transcripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man." (*People v. Brown* (1990) 225 Cal.App.3d 585, 599.)

Here there is no showing that the jury "might be misled." The People claim the trial court made the above-quoted general remarks relied on by Sherman only in reference to a telephone conversation that was entirely in English. They contend it subsequently gave jurors an additional instruction containing proper and specific guidance regarding the second tape and transcript containing the translations. We agree.

Before the trial court played the audio tape containing some Spanish language conversations, the prosecution and defense entered into a stipulation. The court advised jurors that they "must accept" the following stipulation: "The transcription and translation of [telephone call No. 2] *is an accurate representation* of the events as they occurred *and the words as they were spoken*." (Italics added.) The court said, "[B]ecause there is no issue as to the validity of those facts, *you must accept them as true*." (Italics added.) Consequently, all jurors were instructed to rely on the translation of the Spanish words on the audio tape found in the transcript. We presume the jurors followed this instruction. (*People v. Edwards*, *supra*, 57 Cal.4th at p. 745.) Sherman has made no showing that there were any bilingual jurors or that they disobeyed the court's instructions. Moreover, Sherman has made no showing that the transcripts and translations were inaccurate, inadequate or misleading.

*Instructing on an Uncharged Conspiracy and a Coconspirator's Statements*

Sherman contends the trial court erred by not giving jury instructions on the elements of an uncharged conspiracy and guidance on how to consider whether a coconspirator's statements should be considered. She claims the court should have instructed jurors that Diaz's statements could not be considered unless there was evidence that he was involved in a conspiracy with her to sell drugs. The People agree.

Here the prosecution did not charge Sherman with conspiracy. But the audio tapes reflect that Diaz and Sherman participated in the telephone conversations initiated to complete a drug sale. Sherman and the People agree that the trial court had a duty to give an instruction on how to consider evidence of an uncharged conspiracy because of these conversations. "The court has a sua sponte duty to give [an uncharged conspiracy] instruction when the prosecution has not charged the crime of conspiracy but

7

has introduced evidence of a conspiracy to prove liability for other offenses or *to introduce hearsay statements of coconspirators*." (Bench Notes following CALCRIM No. 416 [Evidence of Uncharged Conspiracy], italics added; *People v. Ditson* (1962) 57 Cal.2d 415, 447.)

The People claim the trial court erred because "the statements . . . made by Diaz to the CI against [Sherman] as statements of a coconspirator" were inadmissible without proof of several preliminary facts. "'Once independent proof of a conspiracy has been shown, three preliminary facts must be established: "(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy."'" (*People v. Jeffery* (1995) 37 Cal.App.4th 209, 215.) The court also should have told jurors "that it was not to consider the statement of a coconspirator [Diaz] unless it found, independent of the statement, that a conspiracy existed at the time the statement was made." (*People v. Herrera* (2000) 83 Cal.App.4th 46, 65-66.) Sherman and the People are correct that the court omitted the required instructions.

But the People argue the error is harmless because there is compelling evidence of Sherman's guilt on the charged offenses. We agree. There is no reasonable probability that had the trial court given the required instructions the result would change. (*People v. Sully* (1991) 53 Cal.3d 1195, 1231-1232.) The telephone conversations and other evidence show that Diaz assisted Sherman in her plan to sell drugs to the CI. Sherman said that she authorized Diaz to answer her telephone and talk to the CI, that Diaz knew the CI owed Sherman money, and that Diaz "was very upset about" it. Diaz felt the CI "was taking too long to pay [Sherman] back." He conveyed Sherman's message to the CI about whether he had the money for the drug sale and he went with her to the appointment at the shop.

Moreover, excluding Diaz's statements would not diminish the strong case the prosecution presented against Sherman. The text messages unequivocally show that

8

Sherman had agreed to sell drugs to the CI. She transported the eight ball of methamphetamine that she agreed to deliver in her text message. It was contained in a bindle. She arrived at the agreed meeting place. She had the type of scale drug dealers use to weigh narcotics. Her cell phone contained evidence of her involvement in other illegal drug sales. She testified she was unfamiliar with the drug sale business. But she was impeached by her prior convictions and her text messages.

We have reviewed Sherman's remaining contentions and we conclude she has not shown reversible error.

The judgment is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.


We concur:


YEGAN, J.


PERREN, J.


9

Ryan J. Wright, Judge

Superior Court County of Ventura

_____


William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.


Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.