Filed 9/6/22  P. v. Nance CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GERALD NANCE et al.,<br><br>        Defendants and Appellants. | E075270<br><br>(Super.Ct.No. FSB1102845)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr.  Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant, Gerald Nance.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant, Lori Whipple.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sedival, Andrew

1

Mestman and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Gerald Nance and Lori Whipple were convicted of special circumstance murder and sentenced to life without the possibility of parole. On appeal, they contend that the trial court erred in not giving certain jury instructions, excluding certain evidence, and imposing improper sentences. We agree with Nance and Whipple that the trial court erred at sentencing, but its errors do not require us to vacate the life sentence. We otherwise find no errors in the trial court's actions and affirm.[1]

## I. BACKGROUND

Lafe Humble had moved to Rialto from Kentucky to be closer to family. He worked part-time for his sister and drove a red truck with out-of-state license plates.

On June 15, 2011, Humble's sister paid Humble $300 in hundred-dollar bills for work he had done that day. Humble did not have a bank account, so he added the $300 to the $1,800 cash he already had in his wallet.

That night, he went to drink at El Toro Bar and Grill. He eventually asked the bartender to call him a cab while also expressing concern about leaving his truck in the parking lot overnight. Defendant Whipple, who had been working in the bar section that night, agreed to drive Humble home in his truck.

Whipple drove Humble in his truck to a gas station. Footage from the gas station showed that defendant Nance followed Humble's truck in a blue car. After purchasing

---

[1] Undesignated statutory references are to the Penal Code.

2

gas and making another stop at a convenience store, they made their way to Robin Peterson's house, where Whipple lived.

Peterson did not like Whipple bringing strangers to the house. Whipple whispered to Peterson: "I'm sorry I brought this guy to your house. He has got a lot of money. We're thinking about robbing him." Humble purchased methamphetamine from Peterson and did some lines with Nance and Whipple before Humble, Nance, and Whipple left the house.

Whipple then drove Humble's truck down an emergency access road leading to a ravine. Nance parked his car nearby and walked down the emergency access road. He ran back to his car a few minutes later, then walked down the emergency access road again, where he stayed for approximately 22 minutes. During those 22 minutes, Nance's phone accidentally dialed Peterson's number. Peterson heard Humble "screaming for his life" and repeatedly saying, "Please don't hit me anymore. Please just don't hit me anymore." Nance then ran back to his car, drove down the emergency access road, then drove back up a few minutes later and left the scene with Whipple. Approximately an hour later, surveillance footage showed Nance and Whipple, in changed clothes, purchasing a gasoline container and lighters. Footage from near the ravine showed that Nance and Whipple returned to the ravine soon before smoke began to rise from the area.

A few days later, Peterson read an article about the killing of a Kentucky man. When Peterson asked Whipple about it, Whipple told her that it was a robbery gone bad.

Nance and Whipple contended at trial that Nance killed Humble in self-defense after Humble attempted to rape Whipple. Whipple took the stand at trial and testified, for example, that Humble kept touching her while at Peterson's house; that Nance lost sight of Humble's truck; that Humble subsequently took over the steering wheel while she was driving and trying to fight him off, causing the truck to go down the emergency access road toward the ravine; that Nance appeared and fought Humble when he was trying to force himself on Whipple, and that she was walking up the ravine when she saw Nance come up behind her covered in blood. Whipple also denied ever telling Peterson that she and Nance were thinking of robbing him or that it was a robbery gone bad.

Nance and Whipple were charged with first degree murder (§ 187, subd. (a), count 1) and arson of property (§ 451, subd. (d), count 2). The information also alleged that Nance and Whipple committed the murder while engaged in the commission of or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)). Following a joint trial where Whipple testified but Nance did not, the jury found both guilty on both counts.[2] The trial court sentenced both Nance and Whipple to eight months followed by life without the possibility of parole.

## II. DISCUSSION

Nance and Whipple (hereinafter defendants) raise a number of issues in their briefs, some jointly and some individually.

---

[2] The jury found that Whipple was a major participant in the robbery or attempted robbery and that she acted with reckless indifference to human life.

4

First, defendants contend that the trial court abused its discretion in excluding evidence of what they call Humble's "near-term crude sexual appetite" (capitalization removed). Second, Nance contends that the trial court failed to instruct the jury on evidence of an uncharged conspiracy. Third, Nance contends that the trial court failed to instruct the jury on accomplice testimony. Fourth, Nance alleges cumulative error warrants reversal even if no single error warrants reversal. And fifth, defendants contend that the trial court erred in various ways at sentencing. As we explain, only the last contention has merit.

## A. *Exclusion of Evidence*

Before and during trial, defendants sought to introduce three categories of evidence to bolster their claim that Humble had attempted to rape Whipple. The first was a handwritten note, entitled "Escorts to Call," that was found in Humble's home and that contained the names and phone numbers of six women. The second was testimony from a bartender who told police that on the night of the murder Humble "told her he inserted money in the vagina of female strippers." The third was testimony from a waitress that same night that Humble talked about "getting a hooker."

In each case, defendants contended that the evidence was relevant to show Humble's desire to commit unconsented sexual acts. The handwritten note, defendants contended, showed "a certain sexual aggressiveness or willingness to partake in potentially illegal sexual activity" as well as "a willingness to perform rape and other sexual assault." The bartender's testimony was similarly intended to "prove [Humble's]

5

state of mind," and the waitress's testimony went toward Humble's "readiness to commit unwanted sexual acts."

In response, the People contended that the handwritten note did not "indicate[] any type of sexual aggressiveness whatsoever." They also argued that the bartender's testimony was "too far attenuated," in that the jury would have to "extrapolate or attenuate out that [Humble] attempted a 261[3] within 12 hours" of making the statement. As to the waitress's testimony, the People reiterated its argument: "that someone may be at a bar drinking, looking to have sex with someone or talking even about hiring someone to have sex with, this kind of far attenuated statement of hiring a hooker does not indicate a readiness to do evil, a readiness or ability to attempt rape later on that night."

In each case, the trial court excluded the evidence pursuant to Evidence Code section 352. For the handwritten note, the trial court stated that "the probative value does not outweigh any confusion which might result in this case." For the bartender's testimony, the trial court stated that "the prejudice outweighs any probative value." And for the waitress's testimony, the trial court stated again that "the prejudice outweighs any probative value," this time adding that any desire or attempt to hire prostitutes on Humble's part "would be a consensual-type action versus the defense assertion that a rape was involved here, which is non-consensual."

"Evidence Code section 352 permits a trial court, in its discretion, to exclude evidence if its probative value is substantially outweighed by the probability that its

---

[3] This is presumably a reference to section 261, which defines rape.

6

admission will necessitate undue consumption of time or create the substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  The court's ruling is reviewed for abuse of discretion." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 75.)

Defendants contend that the exclusion of this evidence was an abuse of discretion, repeating their argument made in trial court that the evidence showed a willingness to commit unwanted sexual acts.  We disagree.  To rely on the evidence, the jury would have had to conclude, from evidence that Humble interacted with (or sought to interact with) prostitutes, that he attempted to rape Whipple.  Broadly speaking, it would have required finding a desire to violate Whipple's legal consent from acts that indicated no such violation.  Even though, as defendants note, such evidence could have indicated Humble's willingness to break the law for sex, that is not the same as willingness to commit rape, and it was well within the trial court's discretion to find that the evidence required reasoning that was too attenuated such that any probative value would have created undue prejudice or confused the issues.

B.  *Jury Instructions on Coconspirator Statements*

The trial court allowed the People to enter into evidence two statements Whipple made to Peterson:  the first was her statement, before the murder, that she and Nance were going to rob Humble; the second was her statement, after the murder, that it was a robbery gone bad.  The trial court reasoned that both were statements against interest. (See Evid. Code, § 1230; *People v. Cudjo* (1993) 6 Cal.4th 585, 607 [statement against

7

interest may be admissible where it is "sufficiently reliable to warrant admission despite its hearsay character"].)

On appeal, Nance contends that the inclusion of those statements obligated the trial court to instruct the jury on CALCRIM Nos. 416 (Evidence of Uncharged Conspiracy) and 418 (Coconspirator's Statements). We disagree.

CALCRIM No. 416 begins by stating: "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statement of any other member of the conspiracy done to help accomplish the goal of the conspiracy." It then lists the elements necessary for the jury to find that a defendant was a member of a conspiracy. CALCRIM No. 418 generally provides that a coconspirator's statements may not be admitted against a defendant unless certain preliminary facts have been shown, such as that the coconspirator made the statement to further the conspiracy's goals. (See Evid. Code, § 1223.) Nance contends that because the statements were admitted as the statements of a coconspirator, the trial court had a duty to instruct on CALCRIM Nos. 416 and 418 on its own motion, and that its failure to do so resulted in prejudicial error.

Contrary to what Nance contends, the statements were not admitted as coconspirator statements, but as statements against interest. Nance does not contend that the trial court erred in admitting the statements as statements against interest but rather argues that the trial court was obligated to instruct on CALCRIM Nos. 416 and 418 "to the extent" the statements were also admissible as coconspirator statements.

8

Nance is mistaken.  The trial court was under no obligation to instruct on coconspirator statements for the simple reason that membership in a conspiracy was not at issue in the case.  The People, for example, did not attempt to establish Nance's vicarious criminal liability due to his membership in a conspiracy.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 150 ["'an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator'"].)  Rather, the People contended that Nance was criminally liable as the direct perpetrator of both the murder and the arson.  No error arises when a jury is not instructed on something that is not relevant to the issues it is asked to decide.  Accordingly, the trial court did not need to instruct on CALCRIM Nos. 416 and 418.

*C.  Jury Instructions on Accomplice Testimony*

Nance next contends that the trial court failed to *sua sponte* instruct the jury on CALCRIM No. 334, regarding accomplice testimony.  CALCRIM No. 334 "precludes a defendant's conviction based on the testimony of an accomplice unless that testimony is corroborated by independent evidence."  (*People v. Martinez* (2019) 34 Cal.App.5th 721, 729.)  This is in part because "an accomplice may try to shift blame to the defendant in an effort to minimize his or her own culpability."  (*People v. Tobias* (2001) 25 Cal.4th 327, 331.)  According to Nance, the instruction would have prevented the jury from finding him guilty of murder, which was based on a felony murder theory premised on the robbery, as well as finding the robbery special circumstance allegation true, because, as

9

he contends, nothing other than Whipple's testimony showed that the murder occurred during a robbery.

Here, although a single statement from Whipple's trial testimony suggested that Nance planned to commit a robbery, any resulting error from the trial court's failure to instruct on CALCRIM No. 334 would have been harmless because it was sufficiently corroborated by other evidence in the record.

While on the stand, Whipple repeatedly testified that Nance threatened to rob Humble of the drugs he had purchased if he did not stop touching Whipple. (Whipple also testified that she did not think that Nance meant the statement, which he made to Humble, to be taken seriously.) During closing arguments, the People stated that the property at issue in the robbery was money; no mention was made of the drugs Humble had purchased. Thus, none of these statements made by Whipple at trial were offered to prove that the murder occurred during a robbery.

Whipple did tell Peterson prior to the murder that "[w]e're thinking about robbing him." However, neither this statement nor Whipple's later statement (that it was a robbery gone bad) qualified as "testimony" within the meaning of section 1111, on which CALCRIM No. 334 is based. (See *People v. Martinez*, *supra*, 34 Cal.App.5th at p. 729.) "The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is itself sufficiently reliable to be allowed in evidence." (*People v. Sully* (1991) 53 Cal.3d 1195, 1230.) As discussed

above, these statements were allowed in evidence as statements against interest, so it created no issue regarding accomplice testimony.

There is, however, one brief statement that was not directly made at trial and that would have counted as testimony within the meaning of section 1111. At trial, Whipple testified that, following the killing, two detectives approached her while she was working, so she went with them to a police station for questioning. In response to a question at trial about whether she remembered telling a detective at that time that it was Nance's idea to rob Humble, she said yes. (It was soon after this question that Whipple testified that Nance only meant to rob Humble of the drugs he had bought if he did not stop touching Whipple.)

The statement from Whipple that it was Nance's idea to rob Humble was not originally made at trial, yet it would have qualified as "testimony" because it was made under suspect circumstances. "'[T]estimony' within the meaning of Penal Code section 1111 includes all oral statements made by an accomplice . . . under oath in a court proceeding *and* all out-of-court statements of accomplices . . . used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police. These circumstances are most likely to induce self-serving motives and hence untrustworthy and unreliable evidence." (*People v. Jeffery* (1995) 37 Cal.App.4th 209, 218.) Here, the fact that the statement was made under suspect circumstances is

11

confirmed by Whipple's own admission at trial that she "chose not to tell [the detectives] the entire truth" during that interview.

However, any failure by the trial court to instruct the jury on CALCRIM No. 334 based on this single statement was harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.' [Citation.] To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] '"[T]he corroborative evidence may be slight and entitled to little consideration when standing alone."'" (*People v. Avila* (2006) 38 Cal.4th 491, 562-563.)

Keeping in mind that Whipple's statements *to Peterson* do not amount to testimony from an accomplice, but rather out-of-court hearsay statements admissible as statements against interest, we find that Whipple's testimony—that is, her statement to detectives that Nance wanted to rob Humble—was sufficiently corroborated by independent evidence. Put another way, the evidence of Nance intending and committing a robbery did not consist solely of Whipple's statements to detectives following the murder, statements made under suspect circumstances. Such evidence also consisted of statements Whipple made to Peterson, which were made in a more trustworthy environment. (See *People v. Frierson* (1991) 53 Cal.3d 730, 745 ["The focus of the

12

declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration"].)

As a result, any error in not instructing the jury on CALCRIM No. 334 would have been harmless on this record.[4]

*D.  Sentencing Errors*

Defendants claim that the trial court made two errors at sentencing:  first, that the trial court imposed both 25 years to life *and* life without the possibility of parole for the murder, and second, that the abstract of judgment erroneously reflects a $10,000 parole revocation fine, which was not orally imposed at sentencing and which does not apply when the sentence does not include a period of parole.  (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185.)

The record contains a number of ambiguities and outright errors.  When sentencing Whipple, the trial court correctly stated that a murder charge without a special circumstance finding has a term of 25 years to life, but it imposed only a determinate term of eight months (for the arson) followed by life without the possibility of parole. When sentencing Nance, however, the trial court made statements that might be interpreted as ambiguous, even if it is clear enough from the context that Nance and Whipple would be receiving identical sentences.  The transcript shows the following:

---

[4] Because this is the only error we find regarding Nance's conviction, there is no additional error to accumulate, and Nance's claim of cumulative error fails.

"[Court:] So your sentence is as follows, sir: A determinate term in state prison of eight years with an indeterminate—

"[Nance's Counsel]: I'm sorry, your Honor, eight months.

"[Court]: Thank you, Counsel. Eight months, one-third the middle term of two years. [¶] Consecutive will be the Count 1, indeterminate term of 25 years to life. With the special finding pursuant to Penal Code section 192(a)(17), that is life without possibility of parole."

Defendants' abstracts of judgment both contain errors, both with regard to the sentence and the parole revocation fine. Both defendants' abstracts of judgment impose the parole revocation fine under section 1202.45, despite the fact that such fines were not orally imposed at sentencing. Additionally, Nance's abstract of judgment indicates a sentence of life without the possibility of parole for the murder *and* 25 years to life for the murder, while Whipple's abstract of judgment indicates only 25 years to life (i.e., with the possibility of parole) for the murder.

Defendants' sentencing minute orders reflect similar errors: Nance's minute order states a sentence of "8 months followed by an indeterminate term of 25 years to life without the possibility of Parole", while Whipple's minute order states "8 MONTHS followed by an indeterminate term of 25 years to life." Both state that a parole revocation fine was imposed.

14

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

The proper sentence for count 1 for both defendants is life without the possibility of parole, nothing more and nothing less. We order that the abstracts of judgment and sentencing minute orders be corrected to reflect that proper sentence, without the parole revocation fine under section 1202.45 that was not imposed by oral pronouncement.

## III. DISPOSITION

The judgments of conviction are affirmed. The clerk of the superior court is directed to issue an amended abstract of judgment and sentencing minute order for each defendant and to forward them to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

CODRINGTON
Acting P. J.

FIELDS
J.

15