Filed 11/27/23  P. v. Samoata CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATATOA SAMOATA,<br><br>    Defendant and Appellant. | D080333<br><br><br>(Super. Ct. No. SCD288011) |

APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Matatoa Samoata lured a drug dealer to an elementary school by agreeing to buy a pound of marijuana for $1500, only Samoata brought $700 of counterfeit money and a loaded gun. During the transaction, Samoata shot the drug dealer and the drug dealer's companion. The dealer was seriously injured and the companion killed. The jury convicted him of first degree murder and attempted voluntary manslaughter, and found true firearm allegations and a great bodily injury allegation.

On appeal, Samoata asserts the trial court committed three errors: (1) failing to sua sponte instruct the jury on uncharged conspiracy and use of a coconspirator's statements; (2) failing to exercise its discretion to dismiss his sentence enhancements or to impose a lesser firearm enhancement; and (3) failing to determine his ability to pay before imposing fines and fees. Assuming without deciding the court had a sua sponte duty to give conspiracy-related instructions under the circumstances of this case, we conclude any error was harmless. We decline to remand for resentencing because Samoata forfeited his claims of any sentencing error and we find no ineffective assistance of counsel at sentencing. The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Trial Evidence*

A. *The Marijuana Deal and Shooting*

On November 3, 2020,[1] Samoata used his brother's Instagram account—"NoahSamoata123"—to set up a deal where he would buy a pound

---

[1] Further unspecified dates are from the year 2020 unless noted otherwise.

of marijuana from Erik S. for $1500.  The next day, Samoata switched to his brother's Snapchat account—"noahsamoata"—to ask Erik if he wanted to buy a gun.  Erik did not say anything about buying a gun, but he agreed to meet "noahsamoata" in front of an elementary school next to the house where Samoata lived with his family.

On November 6, Erik drove with his friend, Andrew Briseno, from Bakersfield to San Diego to meet "noahsamoata."  Briseno rode in the front passenger seat and, without Erik's knowledge, brought a gun with him.  The pound of marijuana was in the car, in a plastic bag inside of a backpack.  When they got close to the elementary school, Briseno placed the backpack by his feet on the front passenger floorboard.

Samoata was standing outside by the school.  Although Erik was actively chatting with "noahsamoata" through Snapchat, Samoata was not using a phone.  When Erik became suspicious and threatened to leave, "noahsamoata" told Erik it was his "first time" and he had sent a friend—Samoata—who had the money.  Erik pulled up to Samoata and asked, "You want to buy some weed?"  Samoata said "yeah" and got in the back seat of Erik's car, directly behind Briseno.  Samoata handed money to Erik.  While Erik counted the money, the backpack with the marijuana remained next to Briseno.  Neither Erik nor Briseno ever gave Samoata the backpack.

Erik noticed the money was short and looked "weird" or "fake."  He stopped counting and began examining the money.  Then Samoata said, in an aggressive tone of voice, "Give me that shit right now."  As Erik turned to look back at Samoata, Samoata shot him in the left side of his face, under the eye; another shot hit Erik in the foot.  Erik immediately blacked out.  When he woke up, his car was on the sidewalk.  Briseno was unresponsive in the

3

front passenger seat, bleeding from two gunshot wounds to the back of the head.

A neighbor walking her dog heard three or four gunshots "right in a row." She then saw Samoata run back toward his house. So when the police responded, she directed officers to Samoata's house. Samoata barricaded himself in the attic, ignoring the police's commands to surrender. Hours later, Samoata emerged and was arrested.

In the attic, the police found Erik's backpack with the pound of marijuana, a Beretta semiautomatic handgun loaded with five cartridges, other assorted firearms (including a shotgun and rifle), two empty firearm magazines, boxes of ammunition, and shotgun shells. Samoata's and Briseno's DNA was on the Beretta. Ballistics testing established that the bullets and cartridge casings recovered from Erik's car, and from Erik's clothing and Briseno's body, were all fired from the same Beretta.

Briseno's handgun was discovered on the front passenger side floorboard of Erik's car with the handle facing up. There was no evidence it had been fired. About $700 in counterfeit hundred dollar bills was found on the driver's seat and center console.

Erik sustained serious injuries to his face, jaw, and foot that required several surgeries. Briseno died after arriving at the hospital. The cause of his death was gunshot wounds to the head. One bullet entered behind his left ear and exited through his jaw bone in a left to right, back to front, and downward trajectory. A second bullet that penetrated the back of his head and became lodged inside was removed from Briseno's scalp during the autopsy.

4

B.     *Samoata's Varying Accounts of the Shooting*

Samoata gave varying accounts of what happened to law enforcement. He first asserted he was home playing video games and did not hear any gunshots. He then claimed the victims had been "threatening to kill [his] brother," "kidnap [his] sisters and human traffic them," and "kill the rest of [his family]." When he heard the front doorknob "jiggle," he believed it was the victims coming to harm his family. So he armed himself with the Beretta, chased the victims to their car, opened their car door, and fired three or four gunshots from *outside* of the car. After the police told Samoata they were checking for DNA inside Erik's car, Samoata explained he had opened the car door "to check [the victims'] status" after he fired the gun. He claimed he then hid the gun in a neighbor's trash can, and failed to come out of the attic when SWAT surrounded his house because he thought he had a warrant.

Samoata denied the shooting was related to a marijuana deal, told the police they would have to ask his brother because his brother uses Snapchat, and insisted "[t]hese guys were really threatening [his] family." When Samoata learned one of the victims had survived the shooting, he admitted there had been a marijuana deal, but denied it was prearranged. Instead, Samoata said he had been sitting on the front porch of his house when the victims "rolled up." They yelled to him, "Hey, hey," so he walked over to their car. He gave the driver fake money, and the driver started counting it. At this point, the *driver* (not the passenger) reached into the driver's side door pocket. It was then that Samoata shot the driver and the front passenger.

Samoata admitted at trial that all of his statements to the police were lies.

He testified he was going to "[s]cam [Erik] with fake money to get a pound of weed," and then "just leave." He thought the deal "would go bad" because he "had fake money," so he brought a gun with him "[j]ust in case the deal went bad." He made sure the gun was "hot loaded," meaning the magazine was full and there was one round in the chamber, so it was "ready to go."

Samoata testified that when he got in the car and sat in the back passenger seat, he passed the money to Erik when Erik asked for it. Then Briseno passed him back "the bag of weed." When Erik discovered it was fake money, he looked at Briseno, and "then [Briseno] went to reach for something, and [he] heard a metal clicking." And that is when Samoata reached for his gun and "just randomly shot." Samoata admitted neither Erik nor Briseno verbally threatened him, and he did not see a gun. He claimed he "didn't take aim on anyone," although he acknowledged he shot Erik directly in the face, and Briseno twice in the back of the head. He then ran back to his house and hid because he was scared of the police.

Samoata admitted he had communicated with Erik using his brother's Instagram and Snapchat accounts, and he had purchased the fake money "ahead of time" in order to "do these marijuana setup ripoffs." Samoata and his brother were also communicating with other people "to do these setups during th[e] same time frame" he set up the marijuana deal with Erik. He further admitted he sent Erik a Snapchat message asking Erik if he wanted to buy a "strap." He was not really trying to sell Erik one of his guns; instead, he was just checking to see if Erik would be armed.

6

## II.

### *Verdicts*

The jury found Samoata guilty of the first degree murder of Briseno (Pen. Code,[2] §§ 187, subd. (a), 189, subd. (a); count 1) and not guilty of the attempted murder of Erik S. (§§ 187, subd. (a), 664; count 2) but guilty of its lesser included offense of attempted voluntary manslaughter (§§ 192, subd. (a), 664). As to count 1, the jury found true that Samoata personally and intentionally discharged a firearm and proximately caused death (§ 12022.53, subd. (d)). On count 2, the jury found true Samoata personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the attempted voluntary manslaughter.

### DISCUSSION

### I.

### *Samoata Fails to Establish Prejudicial Instructional Error*

Samoata contends the trial court committed instructional error because it failed to instruct the jury with CALCRIM No. 416 (Evidence of Uncharged

---

[2] All further statutory references are to the Penal Code.

Conspiracy)[3] and CALCRIM No. 418 (Coconspirator's Statements).[4] Although Samoata did not request these instructions, he asserts the court had a sua sponte duty to give them because the court admitted evidence pursuant to the coconspirator hearsay exception in Evidence Code section 1223.[5] We review claims of instructional error de novo. (*People v. Posey*

---

3    CALCRIM No. 416 states in relevant part, "A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." It sets forth the elements of a conspiracy, including that "[t]he defendant intended to agree and did agree with [a coparticipant] to commit [the alleged crime]"; "[a]t the time of the agreement, the defendant and . . . the other alleged member[ ] of the conspiracy intended that one or more of them would commit [the alleged crime]"; and "[the] defendant[,] [or the coparticipant,] [or (both/all) of them] committed [at least one of] the following overt act[s] to accomplish [the alleged crime]." (*Ibid.*)

4    CALCRIM No. 418 provides, in relevant part, "In deciding whether the People have proved that [the defendant] committed [any of] the crime[s] charged, you may not consider any statement made out of court by [a coconspirator] unless the People have proved by a preponderance of the evidence that: [¶] 1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made; [¶] 2. [The coconspirator was a member] of and participating in the conspiracy when [he] made the statement; [¶] 3. [The coconspirator] made the statement in order to further the goal of the conspiracy; [¶] AND [¶] 4. The statement was made before or during the time that [the defendant was] participating in the conspiracy. [¶] A *statement* means an oral or written expression, or nonverbal conduct intended to be a substitute for an oral or written expression."

5    Evidence Code section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the

8

(2004) 32 Cal.4th 193, 218.) Assuming without deciding that such a sua sponte duty existed in this case, we reject Samoata's claim because he fails to establish prejudice from the asserted instructional error.

A. *The Evidence Assertedly Triggering a Sua Sponte Duty to Give CALCRIM Nos. 416 and 418*

The evidence assertedly triggering a sua sponte duty to give CALCRIM Nos. 416 and 418 consisted of messages sent to and from the Instagram and Snapchat accounts of Samoata's brother, Noah Samoata,[6] between November 3 (when Samoata admitted he first contacted Erik to set up the marijuana deal) and November 6 (the date of the shooting).[7] In its motion to admit the evidence, the prosecution argued the messages were nonhearsay because they were offered not for their truth but as circumstantial evidence of other relevant matters, such as the existence of a plan and conspiracy to rob a marijuana dealer, and to explain Erik's actions. In the alternative, the prosecution argued the messages were admissible under the coconspirator hearsay exception in Evidence Code section 1223.

Specifically, the evidence admitted at trial consisted of four categories of Instagram and Snapchat messages:

(1) All messages exchanged between Erik and Noah's Instagram and Snapchat accounts from November 3 through November 6. The trial court ruled these messages were admissible for the nonhearsay purpose of explaining Erik's actions and as circumstantial evidence of a conspiracy to

---

facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

[6] To avoid confusion, we refer to Noah Samoata by his first name.

[7] Samoata does not challenge the trial court's decision to admit evidence of the Instagram and Snapchat messages.

9

rob. Erik testified he received these Instagram and Snapchat messages. And as we have mentioned, Samoata admitted at trial he sent these messages to Erik, including the two messages asking Erik if he wanted to buy a gun for the purpose of ensuring Erik would not be armed during the marijuana deal.

(2) Solicitations for marijuana sent from Noah's Snapchat account to 40 to 50 other Snapchat users, during the same time frame Erik received solicitations from Samoata through Noah's Instagram and Snapchat accounts.[8] Some of the recipients, like Erik, were also asked whether they wanted to buy a gun. The prosecution proffered this evidence to show Samoata was "searching for people to set up and rob." Again, Samoata admitted he and his brother were also communicating with other people "to do these setups" when he set up the marijuana deal with Erik.

(3) Videos sent from Noah's Snapchat account to a Snapchat user named "Eli" on November 5. Samoata testified Noah sent the videos to "Eli," another potential setup victim, although "Eli" backed out of the deal. One video showed two people with what appeared to be counterfeit hundred dollar bills. Several aspects of this video (the money, the people's hands and clothing, music playing in the background, and a bedspread visible in the video) were identical to a video Erik received from Noah's Snapchat account. The remaining videos showed both Samoata and Noah with the murder weapon as well as three firearms and a box of ammunition that were recovered from Samoata's attic after the shooting. The trial court ruled these videos were relevant and admissible to show Samoata's access to the murder

---

[8] The remaining three categories of evidence were introduced through an investigator from the District Attorney's office who reviewed records produced by Instagram and Snapchat in response to warrants.

10

weapon and ammunition, and found they were not offered for the truth but as circumstantial evidence of the conspiracy to commit a robbery.

(4) A Snapchat audio message sent from Noah's account to a Snapchat user named "Kenneth" on November 4. Samoata admitted Noah sent a message to "Kenneth" but denied knowing why Noah sent it. In the message, the speaker said there was going to be a "lick . . . tonight" and "he's gonna have a pound."[9] (Erik was initially supposed to deliver the marijuana to San Diego on November 4, but ended up delivering it on November 6 instead.) The District Attorney's investigator testified "lick" was street slang that could mean "a robbery," "to . . . come up on something," or "to take something from somebody else," but "wouldn't really refer to . . . a theft when you're going to sneak and take something without them knowing." Samoata testified his definition of a "lick" was "[c]ome up" or "[g]etting over on somebody," and "[g]etting over on somebody" means "[t]rying to get something for free." The trial court admitted the audio message as circumstantial evidence of a conspiracy to rob Erik of marijuana.

B.    *Analysis*

The parties dispute whether the trial court had a sua sponte duty to instruct the jury with CALCRIM Nos. 416 and 418. Until recently, the Bench Notes to CALCRIM No. 418 provided, "The court has a **sua sponte** duty to instruct on the use of a coconspirator's statement to incriminate a defendant

---

9    The message in its entirety was: "Hey yo bro, can you get back to me bro? (unintelligible) hey so bro there's a lick bro, tonight bro. I need you for tonight, . . . . This thing has no strap for sure bro. I know there's a (unintelligible) another thing. This dude has a whole bunch of money, and he's gonna have a pound bro, a pound. And it's gonna be fire - fire. So, . . . . blood, can you come through . . . ? And if the lick (unintelligible) I'll give you half or a quarter of it . . . ."

11

if the statement has been admitted under Evidence Code section 1223."
(CALCRIM No. 418 (Aug. 2016 rev.) (2022 ed.) pp. 186–187, citing *People v.
Jeffery* (1995) 37 Cal.App.4th 209, 215 and *People v. Herrera* (2000) 83
Cal.App.4th 46, 63.)  If a court instructs a jury with CALCRIM No. 418, it
must also give either CALCRIM No. 415 (Conspiracy) or CALCRIM No. 416.
(See Bench Notes to CALCRIM No. 418.)  Whereas Samoata relies on this
Bench Notes guidance for his position that the court was obligated to sua
sponte instruct the jury on conspiracy and use of a coconspirator's
statements, the People contend neither of the cases cited in the Bench Notes
(*Jeffery* and *Herrera*) stand for such a proposition.

We do not need to resolve this aspect of the parties' dispute.  In March
2023—after Samoata filed his opening brief, but before the People's
respondent's brief and Samoata's reply brief were filed—the Bench Notes
accompanying CALCRIM No. 418 were revised.  They now state:  "It is *an
open question* whether the court has a **sua sponte** duty to instruct on the use
of a coconspirator's statement to incriminate a defendant.  (See *People v.
Prieto* (2003) 30 Cal.4th 226, 251–252 [(*Prieto*)]; *People v. Sully* (1991) 53
Cal.3d 1195, 1231–1232 [(*Sully*)].)  On request, the court must give this
instruction if the statement has been admitted under Evidence Code section
1223."  (Bench Notes to CALCRIM No. 418 (Mar. 2023 rev.), italics added.)
Neither side has argued the guidance from the revised Bench Notes is an
inaccurate statement of the law.

The parties also dispute whether a duty to instruct was triggered in
this case.  Samoata contends it was because the trial court admitted the
Instagram and Snapchat messages sent from Noah's account under Evidence
Code section 1223.  The People contend no such duty arose because the court

did not admit the messages under the coconspirator exception to the hearsay rule. Rather, it admitted them as nonhearsay.

The People are correct that the trial court admitted the messages as nonhearsay. But this does not necessarily compel the conclusion that instructions on conspiracy and use of a coconspirator's statements were not required. " ' " 'It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence' " and " 'necessary for the jury's understanding of the case.' " ' " (*People v. Molano* (2019) 7 Cal.5th 620, 667.) In ruling the messages were admissible, the court reasoned, in part, that they were circumstantial evidence of a conspiracy to rob. The relevance and the nonhearsay purpose for which the messages were offered thus depended on the existence of a conspiracy between Samoata and his brother.

The current Bench Notes to CALCRIM No. 418 state there may be "a **sua sponte** duty *to instruct on the use of a coconspirator's statement to incriminate a defendant.*" (Bench Notes to CALCRIM No. 418 (Mar. 2023 rev.), italics added.) The quoted language does not reference Evidence Code section 1223 or confine the possible sua sponte instructional duty to cases involving this hearsay exception. Here, although it was established at trial that certain Instagram and Snapchat messages originating from Noah's account were sent by Samoata, there was also evidence some of them were sent by Noah. Although the messages were used to prove facts other than the matters asserted within them, it is still the case that "a coconspirator's statement" was used "to incriminate" Samoata. (See Bench Notes to CALCRIM No. 418 (Mar. 2023 rev.).) Taken to their logical conclusion, the revised Bench Notes to CALCRIM No. 418 suggest it is an "open question"

13

whether a sua sponte duty to give CALCRIM No. 418 (and with it, CALCRIM No. 416) exists in a case such as this.

Ultimately we find it unnecessary to answer this question. In *Sully* and *Prieto*, the California Supreme Court assumed without deciding that the trial court had a sua sponte duty to instruct the jury on the definition of an uncharged conspiracy and the requirements for admissibility of a coconspirator's statements where such statements were admitted at trial pursuant to Evidence Code section 1223. (*Sully*, *supra*, 53 Cal.3d at p. 1231; *Prieto*, *supra*, 30 Cal.4th at p. 251.) We take the same approach here. That is, even if we " '[a]ssum[e] the court had a sua sponte duty to so instruct the jury under these circumstances,' the error was harmless." (*Prieto*, at p. 251, quoting *Sully*, at p. 1231.)

The failure to instruct jurors regarding coconspirator statements is governed by the state law harmless error standard and is deemed harmless unless it is reasonably probable that a result more favorable to the defendant would have been achieved in the absence of the error. (*Prieto*, *supra*, 30 Cal.4th at pp. 251–252; *Sully*, *supra*, 53 Cal.3d at pp. 1231–1232; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) The defendant bears the burden of demonstrating prejudice under this standard. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 201.)

Samoata fails to carry his burden of showing there is a reasonable probability instructing the jury with CALCRIM Nos. 416 and 418 would have improved his results at trial. This is his theory of prejudice: The Instagram and Snapchat messages influenced the jury's determination whether he intended to commit a robbery at the time of the shooting, which in turn

14

affected its decision as to whether the homicide of Briseno constituted felony murder.[10]

Samoata's prejudice arguments suffer from two fundamental flaws. First, he broadly characterizes all of the messages sent from Noah's Instagram and Snapchat accounts as "text and video evidence from Noah," "Noah's . . . messages," and "Noah's conduct and statements." He asserts "the arrangements [with Erik] were made by Noah sending messages over social media." These are not accurate characterizations of the evidence. Contrary to Samoata's apparent effort to portray all of the Instagram and Snapchat messages as statements of Noah, Samoata testified at trial that he sometimes used Noah's Instagram and Snapchat accounts, and he specifically used them in this case to communicate with Erik. Samoata admitted *he* located Erik on Instagram; *he* used Noah's account to send Erik messages through Instagram; and *he* entered into an agreement via these messages for Erik to sell him a pound of "weed" in exchange for $1500. Samoata further testified it was his voice in the Snapchat audio messages asking Erik if he wanted to buy a "strap," and that he sent these messages to confirm Erik would not be armed. Samoata also admitted he and Noah were the two people shown in the Snapchat videos sent from Noah's account. To the extent these videos recorded Samoata's verbal and nonverbal expressions, the expressions were his own, not his brother's. The imprecision with which Samoata

---

[10]     The jury was instructed on first degree willful, deliberate, and premeditated murder; first degree robbery murder (and, correspondingly, the elements of robbery); justifiable homicide committed in self-defense; and voluntary manslaughter arising from imperfect self-defense. It was also instructed on attempted murder and attempted voluntary manslaughter arising from imperfect self-defense.

15

characterizes the trial record undermines the persuasive value of his prejudice arguments.

Second, and more importantly, Samoata does not meet his burden of affirmatively establishing that instructing the jury with CALCRIM Nos. 416 and 418 likely would have made a difference in the outcome of the trial. He merely argues that "[i]f properly instructed on uncharged conspiracy and how to consider coconspirator statements, *the jury may well have found* that the prosecution failed to establish by a preponderance of the evidence that either [(1)] a conspiracy between Noah and [Samoata] existed or that [(2) Samoata] was a member of any conspiracy when Noah was sending texts about guns or doing a 'lick.' " (Italics added.) He does not support this assertion with a citation to legal authority, and he does not develop the argument further. Samoata's bare assertion about what the jury "may" have found raises only an abstract possibility of prejudice. Arguments that raise only an abstract possibility of prejudice do not satisfy the *Watson* standard. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

Having reviewed the record, we also do not agree with Samoata's assertion that a jury, instructed with CALCRIM Nos. 416 and 418, would have found insufficient evidence that "a conspiracy between Noah and [Samoata] existed." The evidence of a conspiracy between Noah and Samoata was strong. Samoata admitted he found Erik on Instagram by searching for terms like "plugs" or "weed,"[11] that he messaged Erik because he was trying to "[s]cam [Erik] with fake money to get a pound of weed," and that he personally procured the fake money that was to be used to pull off the scheme. Samoata testified he became involved after Noah asked him to "do

---

[11]    As Erik explained, a "plug" means "someone who has weed."

the deal" because Noah was scared. Samoata specifically admitted sending Erik the message, "Yo, you want to buy a strap," and that his purpose in doing so was to see if Erik would be armed. He acknowledged that asking if the victim wanted to buy a gun was "something [Samoata] . . . or [Noah] would do when . . . trying to do these setups." He admitted that when Erik arrived in San Diego, Samoata was "outside to do the setup" while Noah was communicating with Erik. Samoata's testimony alone amply proved a conspiracy between him and Noah existed. (See CALCRIM No. 416 ["An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime."].)

We also do not agree with Samoata's claim the jury would have found insufficient evidence that "[Samoata] was a member of any conspiracy" *when* the messages about guns or doing a "lick" were sent. (See CALCRIM No. 418 [People must establish that "[t]he statement was made before or during the time that [the defendant was] participating in the conspiracy"].) The message to "Kenneth" about a "lick" was sent on the afternoon of November 4, and the videos showing Noah and Samoata with guns were sent to "Eli" on November 5. These communications were all sent after November 3, when Samoata sent his first Instagram message to Erik. Samoata testified he sent messages to Erik in order to "[s]cam him with fake money to get a pound of weed," and he became involved in doing the deal with Erik at Noah's behest. The messages about guns or a "lick" all postdated the point when Samoata first became involved in the scheme.

Samoata's other prejudice arguments are similarly unavailing. He observes that in closing arguments to the jury, his trial counsel argued no robbery was committed because Briseno handed Samoata the backpack with the marijuana before Samoata began shooting. He points out that the jury

17

sent a note asking whether the backpack changed possession when Briseno handed it to Samoata, and contends the jury's note shows it was focused on whether a robbery, and therefore a robbery-murder, occurred. The difficulty with this argument is that the social media messages had no bearing on the jury's determination of whether Briseno gave Samoata the backpack before the shooting. In Samoata's version of the events, it was Briseno who handed the backpack over, making it Briseno's decision whether to do so. The Instagram and Snapchat messages sent from Noah's account were sent by Samoata and Noah. The messages reflected *their* intentions, not the mindset of Briseno.

Finally, Samoata contends the prosecutor "leaned heavily" on the Instagram and Snapchat messages in her closing arguments to the jury "to prove theories of both premeditated and robbery-felony murder." But because Samoata does not establish there is a reasonable likelihood the jury would have declined to consider any of the messages had it been instructed with CALCRIM Nos. 416 and 418, this contention fails. To the extent that Samoata complains the prosecutor told the jury the messages showed a "plan" or "conspiracy to rob," whereas his own counsel told the jury Samoata's intent was "to 'scam,'" it is apparent from the record the real dispute at trial was not whether a conspiracy existed, but whether its object was to "rob" or to "scam" the victims. The jury was instructed on the legal definition of robbery pursuant to CALCRIM No. 1600. It was also instructed pursuant to CALCRIM No. 200 that it was required to follow the court's instructions rather than the attorneys' comments on the law. We presume that in deciding whether Samoata intended to commit a robbery that "the jury followed the instructions notwithstanding the prosecution's arguments." (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 62; *People v. Osband* (1996) 13

18

Cal.4th 622, 717 [courts of review " 'presume that jurors treat the court's instructions as a statement of law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade' "].)

## II.

*Samoata Fails to Establish He Is Entitled to a Remand for Resentencing*

In a bifurcated proceeding, the jury found the following aggravating sentencing factors to be true:  (1) the offense involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; and (2) Samoata was armed with or used a handgun during the commission of "the offense."  The trial court sentenced Samoata to 25 years to life for the first degree murder of Briseno (count 1) and 25 years to life for the associated section 12022.53, subdivision (d), firearm enhancement.  On the attempted voluntary manslaughter of Erik (count 2), the court imposed the middle term of three years plus the middle term of four years for the section 12022.5, subdivision (a), firearm enhancement, and the mandatory three years for the section 12022.7, subdivision (a), great bodily injury enhancement.  All terms were run consecutively, making Samoata's total sentence 60 years to life.

Samoata seeks a remand for resentencing on two claims of error.  First, he contends the trial court, in imposing sentence, failed to recognize or to exercise its discretion under section 1385, subdivision (c)(2), to strike any or all of the enhancements, or under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) to substitute his firearm enhancement under section 12022.53, subdivision (d), with a lesser included firearm enhancement.  Second, he contends the court failed to determine his ability to pay pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164 (*Dueñas*); alternatively, his counsel was ineffective for failing to object to the imposition of fines and fees

19

without a *Dueñas* hearing.  We conclude Samoata fails to establish he is entitled to a remand for resentencing on any of these grounds.

A.    *Section 1385, Subdivision (c)(2)*

Effective January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81) amended section 1385 to provide that the presence of one of nine enumerated mitigating circumstances "weighs greatly in favor of dismissing the enhancement . . . unless the court finds that dismissal of the enhancement would endanger public safety." (Stats. 2021, ch. 721, § 1; see § 1385, subd. (c)(2).)  On appeal, Samoata contends two mitigating circumstances exist in his case: "(B)  Multiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed.  [¶]  (C)  The application of an enhancement could result in a sentence of over 20 years.  In this instance, the enhancement shall be dismissed." (§ 1385, subd. (c)(2).)  He asserts the trial court was required "to dismiss all of the enhancements[12] and impose a sentence of 25 years to life."

Samoata filed a sentencing brief asking the trial court to exercise its discretion "pursuant to Section 1385" to dismiss or strike the sections 12022.53, subdivision (d), and 12022.5, subdivision (a), firearm enhancements, and the section 12022.7, subdivision (a), great bodily injury enhancement.  In support of his request, he cited his youth (he was 20 when he committed the offenses and 22 at the time of sentencing), remorse, and "limited prior non-violent criminal history."  He asked for a total sentence of 25 years to life.  At the sentencing hearing, Samoata reiterated the request to strike the enhancement allegations "pursuant to 1385," for the additional

---

12    Samoata is incorrect.  Subdivision (c)(2)(B) of section 1385 only authorizes dismissal of all but one of the enhancements, not all of them.

reasons that he suffered from medical problems and had acted out of an unreasonable belief that he was in danger.

Although Samoata's trial counsel did not request dismissal of enhancements under subdivision (c)(2) of section 1385, Samoata contends this issue has not been forfeited, for two reasons: because his trial counsel cited section 1385 in seeking dismissal of enhancements; and because the trial court was "statutorily required to exercise its discretion and consider statutory mitigating factors" and "[t]here is no indication the court did either." We reject these contentions and conclude the issue has been forfeited.

First, we disagree with Samoata's claim that his trial counsel's citation to section 1385 was sufficient to preserve the specific sentencing issue he raises on appeal. The forfeiture rule applies to alleged sentencing errors just as with other claims of trial court error. "[U]nless a party makes a contemporaneous objection, he or she generally cannot challenge a court's ruling for the first time on appeal." (*People v. McCullough* (2013) 56 Cal.4th 589, 594; see *People v. Welch* (1993) 5 Cal.4th 228, 234 ["It is settled that failure to object and make an offer of proof at the sentencing hearing concerning alleged errors or omissions in the probation report waives the claim on appeal."].) Although Samoata's trial counsel cited section 1385 at sentencing, the citation to the statute was generic and did not specifically reference subdivision (c)(2), and his counsel relied on entirely different factual grounds than those Samoata invokes on appeal. Where, as here, counsel's trial court objections fail to reasonably specify the claim presented on appeal, the issue is forfeited. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 21.)

Even if not forfeited, Samoata's attempts to establish that the trial court affirmatively committed an abuse of discretion are unpersuasive. While Samoata contends the court was required to exercise its discretion under section 1385, subdivision (c)(2), and asserts "[t]here is no indication" the court exercised its discretion, we do not infer an abuse of discretion from a silent record. The court was presumably aware of current law in effect at the time of sentencing, including Senate Bill 81, which became effective on January 1, 2022, three months before Samoata was sentenced. "[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 (*Gutierrez*); see *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1517 ["[the] general rules concerning the presumption of regularity of judicial exercises of discretion apply to sentencing issues"].)

Seeking to avoid the doctrine that we cannot infer an abuse of discretion on a silent record, Samoata attempts to recast the trial court's authority under section 1385, subdivision (c)(2), as mandatory rather than discretionary. He analogizes this case to *People v. Panozo* (2021) 59 Cal.App.5th 825, 840–841. In *Panozo*, this court addressed a claim of sentencing error under section 1170.9,[13] which authorizes alternative

---

[13] Section 1170.9 provides, in relevant part, "(a) In the case of any person convicted of a criminal offense who could otherwise be sentenced to county jail or state prison and who alleges that the person committed the offense as a result of sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems stemming from service in the United States military, the court shall, prior to sentencing, make a determination as to whether the defendant was, or currently is, a member of the United States military and whether the defendant may be suffering from

commitment for eligible military veterans convicted of felonies, and section 1170.91,[14] which requires courts to consider evidence a military veteran is suffering from trauma as a circumstance in mitigation at sentencing. (*Panozo*, at pp. 832, 835–836.) Observing that both statutes repeatedly used the word "shall" to describe the court's sentencing obligations (*id.* at p. 836; see § 1170.9, subd. (a) [stating "the court *shall, prior to sentencing, make a determination* as to whether . . . the defendant may be suffering from [trauma, substance abuse, or mental health problems] as a result of [military] service," italics added]), we concluded that both provisions, by their plain language, "unambiguously *obligate* a sentencing court to consider a defendant's service related PTSD, substance abuse, or other qualifying conditions" (*Panozo*, at p. 836). Because the statutes described the court's obligations as mandatory, we held that "compliance with the mandates of

---

sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of the person's service. The court may request, through existing resources, an assessment to aid in that determination. [¶] (b)(1) If the court concludes that a defendant convicted of a criminal offense is a person described in subdivision (a), and if the defendant is otherwise eligible for probation, the court shall consider the circumstances described in subdivision (a) as a factor in favor of granting probation."

14    Section 1170.91 provides, in relevant part, "(a) If the court concludes that a defendant convicted of a felony offense is, or was, a member of the United States military who may be suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of the defendant's military service, the court shall consider the circumstance as a factor in mitigation when imposing a sentence. This consideration does not preclude the court from considering similar trauma, injury, substance abuse, or mental health problems due to other causes, as evidence or factors in mitigation."

23

sections 1170.9 and 1170.91 cannot be inferred from an ambiguous record." (*Id.* at pp. 836–837.)

*Panozo*'s holding does not apply here. Although subdivision (c)(2)(B) and (C) of section 1385 use the words "shall be dismissed," other courts have consistently rejected the contention that they mandate dismissal of enhancements. (See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 294–297; *People v. Anderson* (2023) 88 Cal.App.5th 233, 238–240, review granted Apr. 19, 2023, S278786; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–21; *People v. Walker* (2022) 86 Cal.App.5th 386, 395–398, review granted Mar. 22, 2023, S278309 (*Walker*).) These courts have reasoned that the statutory words "shall be dismissed" cannot be read in isolation and have considered the statute's repeated characterization of the dismissal authority it confers as discretionary. (See, e.g., *Walker*, at pp. 396–398; *Lipscomb*, at p. 18; *Anderson*, at p. 239; *Mendoza*, at pp. 295–296.) We find the reasoning and holdings of these cases to be persuasive, and need not repeat their analysis here.[15]

The presence of statutory language confirming the authority conferred is discretionary distinguishes section 1385, subdivision (c), from the statutes at issue in *Panozo*. Further, section 1385, subdivision (c), unlike section 1170.9, does not state that the court must "make a determination" about the defendant's condition "prior to sentencing." (Cf. § 1170.9, subd. (a).) These

_____

[15] Although Samoata emphasizes that *Walker, supra*, 86 Cal.App.5th at pages 399–400 construed section 1385, subdivision (c)(2), as tipping the balance "in favor of dismissal" unless the mitigating circumstances favoring dismissal are "rebutted by the court's finding that dismissal would endanger public safety," it is still the case that *Walker* held the dismissal authority conferred by the statute is discretionary (see *Walker*, at pp. 396–398, review granted).

24

distinctions between the statutes at issue in *Panozo* and section 1385, subdivision (c)(2)(B) and (C), render *Panozo*'s holding inapplicable to Samoata's claim of sentencing error.[16]

Samoata argues to the extent we conclude (as we have) that his trial counsel's inaction resulted in forfeiture of his claim that he was entitled to dismissal of enhancements under section 1385, subdivision (c)(2)(B) and (C), he was provided ineffective assistance of counsel. We reject the claim because he fails to show that he was prejudiced. To demonstrate ineffective assistance of counsel, a defendant "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, at p. 694.) In demonstrating prejudice, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937 (*Williams*).)

---

[16] Two other cases cited by Samoata (*In re D.L.* (2012) 206 Cal.App.4th 1240, and *In re Sean W.* (2005) 127 Cal.App.4th 1177) are also distinguishable. *In re D.L.*, like *Panozo* but unlike this case, involved a failure to fulfill judicial duties that were mandatory rather than discretionary. (See *In re D.L.*, at p. 1244 [juvenile court failed to fulfill its mandatory duty to conduct a hearing and consider juvenile's suitability for deferred entry of judgment].) In *In re Sean W.*, the juvenile court made statements on the record that affirmatively showed it was unaware of the scope of its discretion. (See *In re Sean W.,* at pp. 1181–1182.) Such a scenario did not occur here.

Even if we assume counsel's performance was deficient, Samoata fails to carry his burden of establishing that he suffered resulting prejudice. (See *Strickland, supra,* 466 U.S. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed"].) As we have explained, subdivision (c)(2) of section 1385 states dismissal of enhancements is not justified if the court finds it would "endanger public safety." (See § 1385, subd. (c)(2) [" 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."].)

Samoata barely touches on this requirement in his appellate briefing. His closest attempt to address it consists of a bare assertion that the mitigating circumstances in subdivision (c)(2)(B) and (C) of section 1385 were not "rebutted [by evidence public safety would be endangered by dismissal of the enhancements] on this record." He fails to elaborate on this point or to explain why he believes it is so. Such an undeveloped assertion unsupported by legal argument is not sufficient to meet an appellant's burden to affirmatively demonstrate prejudice. (See *People v. Smith* (2003) 30 Cal.4th 581, 616, fn. 8 ["We need not consider such a perfunctory assertion unaccompanied by supporting argument."]; *People v. Jones* (1998) 17 Cal.4th 279, 304 [rejecting appellant's claim where it was presented "perfunctorily and without supporting argument"].)

Moreover, contrary to Samoata's perfunctory assertion, the jury found true that Samoata committed an offense that involved "great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." The trial court echoed this finding in its sentencing decision, stating it "was impacted by the callousness, the viciousness, the violence that

26

the defendant engaged in when he discharged his gun at two separate young men, killing one and almost killing the other." Samoata fails to discuss the jury's finding or the court's reliance on it at sentencing, both of which undermine his contention the mitigating circumstances in subdivision (c)(2)(B) and (C) were not rebutted. We conclude Samoata has not established he was prejudiced by his trial counsel's failure to seek dismissal of his enhancements under section 1385, subdivision (c)(2)(B) and (C). Consequently, his claim of ineffective assistance of counsel fails.

B.     Tirado

Samoata alternatively argues a remand for resentencing is required because the trial court did not understand it had the discretion to substitute a lesser firearm enhancement for the section 12022.53, subdivision (d), enhancement. His argument relies in part on *Tirado*, *supra*, 12 Cal.5th 688, in which the California Supreme Court held sentencing courts have discretion under subdivision (h) of section 12022.53 to strike or dismiss a section 12022.53, subdivision (d), enhancement and impose one of the lesser enhancements in subdivisions (b) or (c) of section 12022.53 even where, as here, the lesser enhancements were not charged in the information or found true by a jury. (*Tirado*, at pp. 696, 700.) Under section 12022.53, a violation of subdivision (d) carries a sentence of 25 years to life; a violation of subdivision (c) results in a consecutive sentence of 20 years; and a violation of subdivision (b) results in a consecutive sentence of 10 years. (See § 12022.53, subds. (b)–(d).) Under subdivision (h) of section 12022.53, "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."

Section 12022.5 authorizes enhanced sentences for use of a firearm in the commission of *any* felony, unlike section 12022.53, which applies only to

specified felonies.  (*Id.*, subd. (a).)  The sentences available under section 12022.5 are generally shorter than the sentences authorized by section 12022.53.  (See § 12022.5, subd. (a) [providing for a term of imprisonment in state prison of three, four, or 10 years].)  Courts of Appeal are divided on whether *Tirado*'s holding can be extended to support the trial court's exercise of discretion to strike a section 12022.53 enhancement and substitute an uncharged enhancement under section 12022.5.  (Compare *People v. Johnson* (2022) 83 Cal.App.5th 1074, 1086–1093 [holding the trial court does have discretion to substitute an uncharged lesser enhancement for a stricken section 12022.53, subdivision (b), enhancement], review granted Dec. 14, 2022, S277196, with *People v. Lewis* (2022) 86 Cal.App.5th 34, 39–42 [disagreeing with *Johnson* and holding section 12022.53 does not authorize imposition of more lenient enhancements outside its statutory framework].)

Samoata asks us to follow *Johnson,* and urges us to remand his case for resentencing because the trial court "appeared unaware of its discretion" to substitute a lesser enhancement under subdivisions (b) or (c) of section 12022.53, or section 12022.5, subdivision (a), in place of the 25-year-to-life sentence he received under section 12022.53, subdivision (d).  We need not decide whether *Johnson*'s holding is correct.  Even if we assume courts have discretion to substitute a section 12022.5 enhancement for one imposed under section 12022.53, *Tirado* was decided in January 2022, well before the April 2022 sentencing hearing in this case.  The court was presumably aware of *Tirado* and its potential implications at the time of sentencing.  Again, we cannot presume an abuse of discretion where, as here, "the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*Gutierrez, supra,* 174 Cal.App.4th at p. 527.)

Further, Samoata's trial counsel failed to ask for a lesser firearm enhancement penalty at the time of sentencing, thereby forfeiting the opportunity to challenge the court's failure to substitute the firearm enhancement of which he was convicted for a lesser one. Although Samoata claims his counsel was ineffective for failing to request this relief at sentencing, he fails to establish that he was prejudiced by his counsel's allegedly deficient performance. (See *Strickland*, *supra*, 466 U.S. at p. 694.) His prejudice argument is that the court "may well have" imposed a lesser enhancement if requested to do so because it imposed the middle term rather than the upper term for the count 2 firearm enhancement.

We do not agree with this reasoning. At the time Samoata was sentenced, the middle term of any determinate sentencing triad was the presumptive sentence. (§ 1170, subd. (b)(1); see Stats. 2021, ch. 731 [eff. Jan. 1, 2022; enacting Sen. Bill No. 567 (2021–2022 Reg. Sess)].) Courts could impose upper term sentences only in limited circumstances. (See § 1170, subd. (b)(2) [stating, in part, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term"].) The trial court's finding that the circumstances in aggravation were *not* sufficient to support an upward departure from the presumptive middle-term sentence on the count 2 firearm enhancement does not support the conclusion it *would* have departed downward and imposed a lesser penalty on the count 1 firearm enhancement had Samoata's counsel asked it to do so.

Moreover, the record otherwise fails to disclose a reasonable probability the trial court would have granted such relief. The court denied Samoata's motion to dismiss the count 2 firearm enhancement under section 1385 in

favor of imposing a four-year prison term. It is not likely that a court unwilling to grant Samoata a four-year sentencing reprieve from a firearm enhancement penalty would grant him a reprieve of 10 years or more if given the opportunity.

C.    Dueñas

The trial court imposed a $10,000 restitution fine (Pen. Code, § 1202.4), a $10,000 stayed parole revocation fine (Pen. Code, § 1202.45), a court security fee of $80 (Pen. Code, § 1465.8), and a criminal conviction assessment fee of $60 (Gov. Code, § 70373). Samoata appeals these fines and fees on the grounds the court failed to determine his ability to pay before imposing them pursuant to *Dueñas*, *supra*, 30 Cal.App.5th at page 1164. He contends his rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated as a result.

Samoata forfeited these claims by failing to assert an inability to pay objection or to request a hearing regarding his ability to pay when the trial court imposed the fines and fees. (See *People v. Venegas* (2020) 44 Cal.App.5th 32, 42 [failure to object to fines and fees forfeits appellate challenge based on asserted inability to pay]; *People v. Greeley* (2021) 70 Cal.App.5th 609, 624 ["At the time of defendant's sentencing hearing, *Dueñas* had already been decided, and there is no reason why defendant could not have requested an ability-to-pay hearing based on *Dueñas*."].) Samoata alternatively contends his trial counsel was ineffective for failing to raise such an objection at sentencing. However, he fails to address the element of prejudice that is a required component of an ineffective assistance of counsel claim. (See *Williams*, *supra*, 44 Cal.3d at p. 937 [defendant bears the burden of proving prejudice].) We therefore reject this contention.

## DISPOSITION

The judgment is affirmed.


DO, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.