Filed 8/2/24  P. v. Samoata CA4/1
Opinion following transfer from Supreme Court
Corrected version

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATATOA SAMOATA,<br><br>    Defendant and Appellant. | D080333<br><br><br>(Super. Ct. No. SCD288011) |


APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Matatoa Samoata lured a drug dealer to an elementary school by agreeing to buy a pound of marijuana for $1500, only Samoata brought $700 of counterfeit money and a loaded gun. During the transaction, Samoata shot the drug dealer and the drug dealer's companion. The dealer was seriously injured and the companion killed. The jury convicted him of first degree murder and attempted voluntary manslaughter, and found true firearm allegations and a great bodily injury allegation.

On appeal, Samoata asserts the trial court committed three errors: (1) failing to sua sponte instruct the jury on uncharged conspiracy and use of a coconspirator's statements; (2) failing to exercise its discretion to dismiss his sentence enhancements or to impose a lesser firearm enhancement; and (3) failing to determine his ability to pay before imposing fines and fees. As to the first claim of error, assuming without deciding the court had a sua sponte duty to give conspiracy-related instructions under the circumstances of this case, we conclude any error was harmless.

As to the second and third claims of error, in our prior opinion, we declined to remand for resentencing, including because we found the trial court was not unaware of its discretion to impose a lesser firearm enhancement. The California Supreme Court then granted Samoata's petition for review and transferred it to this court, with directions to vacate our decision and reconsider the cause in light of *People v. McDavid* (2024) 15 Cal.5th 1015 (*McDavid*). (*People v. Samoata*, S283319, Supreme Ct. Mins., June 26, 2024.) In compliance with this mandate, we vacate our prior opinion and conclude the matter must be remanded for resentencing so the trial court can exercise its discretion under *McDavid* whether to impose a

2

lesser included firearm enhancement from a statute other than Penal Code[1] section 12022.53.  We affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Trial Evidence*

A.    *The Marijuana Deal and Shooting*

On November 3, 2020,[2] Samoata used his brother's Instagram account—"NoahSamoata123"—to set up a deal where he would buy a pound of marijuana from Erik S. for $1500.  The next day, Samoata switched to his brother's Snapchat account—"noahsamoata"—to ask Erik if he wanted to buy a gun.  Erik did not say anything about buying a gun, but he agreed to meet "noahsamoata" in front of an elementary school next to the house where Samoata lived with his family.

On November 6, Erik drove with his friend, Andrew Briseno, from Bakersfield to San Diego to meet "noahsamoata."  Briseno rode in the front passenger seat and, without Erik's knowledge, brought a gun with him.  The pound of marijuana was in the car, in a plastic bag inside of a backpack.  When they got close to the elementary school, Briseno placed the backpack by his feet on the front passenger floorboard.

Samoata was standing outside by the school.  Although Erik was actively chatting with "noahsamoata" through Snapchat, Samoata was not using a phone.  When Erik became suspicious and threatened to leave, "noahsamoata" told Erik it was his "first time" and he had sent a friend—

_____

[1]    All further undesignated statutory references are to the Penal Code.

[2]    Further unspecified dates are from the year 2020 unless noted otherwise.

3

Samoata—who had the money.  Erik pulled up to Samoata and asked, "You want to buy some weed?"  Samoata said "yeah" and got in the back seat of Erik's car, directly behind Briseno.  Samoata handed money to Erik.  While Erik counted the money, the backpack with the marijuana remained next to Briseno.  Neither Erik nor Briseno ever gave Samoata the backpack.

Erik noticed the money was short and looked "weird" or "fake."  He stopped counting and began examining the money.  Then Samoata said, in an aggressive tone of voice, "Give me that shit right now."  As Erik turned to look back at Samoata, Samoata shot him in the left side of his face, under the eye; another shot hit Erik in the foot.  Erik immediately blacked out.  When he woke up, his car was on the sidewalk.  Briseno was unresponsive in the front passenger seat, bleeding from two gunshot wounds to the back of the head.

A neighbor walking her dog heard three or four gunshots "right in a row."  She then saw Samoata run back toward his house.  So when the police responded, she directed officers to Samoata's house.  Samoata barricaded himself in the attic, ignoring the police's commands to surrender.  Hours later, Samoata emerged and was arrested.

In the attic, the police found Erik's backpack with the pound of marijuana, a Beretta semiautomatic handgun loaded with five cartridges, other assorted firearms (including a shotgun and rifle), two empty firearm magazines, boxes of ammunition, and shotgun shells.  Samoata's and Briseno's DNA was on the Beretta.  Ballistics testing established that the bullets and cartridge casings recovered from Erik's car, and from Erik's clothing and Briseno's body, were all fired from the same Beretta.

Briseno's handgun was discovered on the front passenger side floorboard of Erik's car with the handle facing up.  There was no evidence it

4

had been fired. About $700 in counterfeit hundred dollar bills was found on the driver's seat and center console.

Erik sustained serious injuries to his face, jaw, and foot that required several surgeries. Briseno died after arriving at the hospital. The cause of his death was gunshot wounds to the head. One bullet entered behind his left ear and exited through his jaw bone in a left to right, back to front, and downward trajectory. A second bullet that penetrated the back of his head and became lodged inside was removed from Briseno's scalp during the autopsy.

B.     *Samoata's Varying Accounts of the Shooting*

Samoata gave varying accounts of what happened to law enforcement. He first asserted he was home playing video games and did not hear any gunshots. He then claimed the victims had been "threatening to kill [his] brother," "kidnap [his] sisters and human traffic them," and "kill the rest of [his family]." When he heard the front doorknob "jiggle," he believed it was the victims coming to harm his family. So he armed himself with the Beretta, chased the victims to their car, opened their car door, and fired three or four gunshots from *outside* of the car. After the police told Samoata they were checking for DNA inside Erik's car, Samoata explained he had opened the car door "to check [the victims'] status" after he fired the gun. He claimed he then hid the gun in a neighbor's trash can, and failed to come out of the attic when SWAT surrounded his house because he thought he had a warrant.

Samoata denied the shooting was related to a marijuana deal, told the police they would have to ask his brother because his brother uses Snapchat, and insisted "[t]hese guys were really threatening [his] family." When Samoata learned one of the victims had survived the shooting, he admitted

5

there had been a marijuana deal, but denied it was prearranged. Instead, Samoata said he had been sitting on the front porch of his house when the victims "rolled up." They yelled to him, "Hey, hey," so he walked over to their car. He gave the driver fake money, and the driver started counting it. At this point, the *driver* (not the passenger) reached into the driver's side door pocket. It was then that Samoata shot the driver and the front passenger.

Samoata admitted at trial that all of his statements to the police were lies.

He testified he was going to "[s]cam [Erik] with fake money to get a pound of weed," and then "just leave." He thought the deal "would go bad" because he "had fake money," so he brought a gun with him "[j]ust in case the deal went bad." He made sure the gun was "hot loaded," meaning the magazine was full and there was one round in the chamber, so it was "ready to go."

Samoata testified that when he got in the car and sat in the back passenger seat, he passed the money to Erik when Erik asked for it. Then Briseno passed him back "the bag of weed." When Erik discovered it was fake money, he looked at Briseno, and "then [Briseno] went to reach for something, and [he] heard a metal clicking." And that is when Samoata reached for his gun and "just randomly shot." Samoata admitted neither Erik nor Briseno verbally threatened him, and he did not see a gun. He claimed he "didn't take aim on anyone," although he acknowledged he shot Erik directly in the face, and Briseno twice in the back of the head. He then ran back to his house and hid because he was scared of the police.

Samoata admitted he had communicated with Erik using his brother's Instagram and Snapchat accounts, and he had purchased the fake money "ahead of time" in order to "do these marijuana setup ripoffs." Samoata and

6

his brother were also communicating with other people "to do these setups during th[e] same time frame" he set up the marijuana deal with Erik. He further admitted he sent Erik a Snapchat message asking Erik if he wanted to buy a "strap." He was not really trying to sell Erik one of his guns; instead, he was just checking to see if Erik would be armed.

## II.

### *Verdicts*

The jury found Samoata guilty of the first degree murder of Briseno (§§ 187, subd. (a), 189, subd. (a); count 1) and not guilty of the attempted murder of Erik S. (§§ 187, subd. (a), 664; count 2) but guilty of its lesser included offense of attempted voluntary manslaughter (§§ 192, subd. (a), 664). As to count 1, the jury found true that Samoata personally and intentionally discharged a firearm and proximately caused death (§ 12022.53, subd. (d)). On count 2, the jury found true Samoata personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the attempted voluntary manslaughter.

## DISCUSSION

## I.

### *Samoata Fails To Establish Prejudicial Instructional Error*

Samoata contends the trial court committed instructional error because it failed to instruct the jury with CALCRIM No. 416 (Evidence of Uncharged

7

Conspiracy)[3] and CALCRIM No. 418 (Coconspirator's Statements).[4] Although Samoata did not request these instructions, he asserts the court had a sua sponte duty to give them because the court admitted evidence pursuant to the coconspirator hearsay exception in Evidence Code section 1223.[5] We review claims of instructional error de novo. (*People v. Posey*

---

[3] CALCRIM No. 416 states in relevant part, "A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." It sets forth the elements of a conspiracy, including that "[t]he defendant intended to agree and did agree with [a coparticipant] to commit [the alleged crime]"; "[a]t the time of the agreement, the defendant and . . . the other alleged member[ ] of the conspiracy intended that one or more of them would commit [the alleged crime]"; and "[the] defendant[,] [or the coparticipant,] [or (both/all) of them] committed [at least one of] the following overt act[s] to accomplish [the alleged crime]." (*Ibid.*)

[4] CALCRIM No. 418 provides, in relevant part, "In deciding whether the People have proved that [the defendant] committed [any of] the crime[s] charged, you may not consider any statement made out of court by [a coconspirator] unless the People have proved by a preponderance of the evidence that: [¶] 1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made; [¶] 2. [The coconspirator was a member] of and participating in the conspiracy when [he] made the statement; [¶] 3. [The coconspirator] made the statement in order to further the goal of the conspiracy; [¶] AND [¶] 4. The statement was made before or during the time that [the defendant was] participating in the conspiracy. [¶] A *statement* means an oral or written expression, or nonverbal conduct intended to be a substitute for an oral or written expression."

[5] Evidence Code section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the

(2004) 32 Cal.4th 193, 218.) Assuming without deciding that such a sua sponte duty existed in this case, we reject Samoata's claim because he fails to establish prejudice from the asserted instructional error.

A.   *The Evidence Assertedly Triggering a Sua Sponte Duty To Give CALCRIM Nos. 416 and 418*

The evidence assertedly triggering a sua sponte duty to give CALCRIM Nos. 416 and 418 consisted of messages sent to and from the Instagram and Snapchat accounts of Samoata's brother, Noah Samoata,[6] between November 3 (when Samoata admitted he first contacted Erik to set up the marijuana deal) and November 6 (the date of the shooting).[7] In its motion to admit the evidence, the prosecution argued the messages were nonhearsay because they were offered not for their truth but as circumstantial evidence of other relevant matters, such as the existence of a plan and conspiracy to rob a marijuana dealer, and to explain Erik's actions. In the alternative, the prosecution argued the messages were admissible under the coconspirator hearsay exception in Evidence Code section 1223.

Specifically, the evidence admitted at trial consisted of four categories of Instagram and Snapchat messages:

(1)   All messages exchanged between Erik and Noah's Instagram and Snapchat accounts from November 3 through November 6. The trial court ruled these messages were admissible for the nonhearsay purpose of explaining Erik's actions and as circumstantial evidence of a conspiracy to

---

facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

[6]   To avoid confusion, we refer to Noah Samoata by his first name.

[7]   Samoata does not challenge the trial court's decision to admit evidence of the Instagram and Snapchat messages.

rob. Erik testified he received these Instagram and Snapchat messages. And as we have mentioned, Samoata admitted at trial he sent these messages to Erik, including the two messages asking Erik if he wanted to buy a gun for the purpose of ensuring Erik would not be armed during the marijuana deal.

(2) Solicitations for marijuana sent from Noah's Snapchat account to 40 to 50 other Snapchat users, during the same time frame Erik received solicitations from Samoata through Noah's Instagram and Snapchat accounts.[8] Some of the recipients, like Erik, were also asked whether they wanted to buy a gun. The prosecution proffered this evidence to show Samoata was "searching for people to set up and rob." Again, Samoata admitted he and his brother were also communicating with other people "to do these setups" when he set up the marijuana deal with Erik.

(3) Videos sent from Noah's Snapchat account to a Snapchat user named "Eli" on November 5. Samoata testified Noah sent the videos to "Eli," another potential setup victim, although "Eli" backed out of the deal. One video showed two people with what appeared to be counterfeit hundred dollar bills. Several aspects of this video (the money, the people's hands and clothing, music playing in the background, and a bedspread visible in the video) were identical to a video Erik received from Noah's Snapchat account. The remaining videos showed both Samoata and Noah with the murder weapon as well as three firearms and a box of ammunition that were recovered from Samoata's attic after the shooting. The trial court ruled these videos were relevant and admissible to show Samoata's access to the murder

---

[8] The remaining three categories of evidence were introduced through an investigator from the District Attorney's office who reviewed records produced by Instagram and Snapchat in response to warrants.

weapon and ammunition, and found they were not offered for the truth but as circumstantial evidence of the conspiracy to commit a robbery.

(4) A Snapchat audio message sent from Noah's account to a Snapchat user named "Kenneth" on November 4. Samoata admitted Noah sent a message to "Kenneth" but denied knowing why Noah sent it. In the message, the speaker said there was going to be a "lick . . . tonight" and "he's gonna have a pound."[9] (Erik was initially supposed to deliver the marijuana to San Diego on November 4, but ended up delivering it on November 6 instead.) The District Attorney's investigator testified "lick" was street slang that could mean "a robbery," "to . . . come up on something," or "to take something from somebody else," but "wouldn't really refer to . . . a theft when you're going to sneak and take something without them knowing." Samoata testified his definition of a "lick" was "[c]ome up" or "[g]etting over on somebody," and "[g]etting over on somebody" means "[t]rying to get something for free." The trial court admitted the audio message as circumstantial evidence of a conspiracy to rob Erik of marijuana.

B. *Analysis*

The parties dispute whether the trial court had a sua sponte duty to instruct the jury with CALCRIM Nos. 416 and 418. Until recently, the Bench Notes to CALCRIM No. 418 provided, "The court has a **sua sponte** duty to instruct on the use of a coconspirator's statement to incriminate a defendant

---

9     The message in its entirety was: "Hey yo bro, can you get back to me bro? (unintelligible) hey so bro there's a lick bro, tonight bro. I need you for tonight, . . . . This thing has no strap for sure bro. I know there's a (unintelligible) another thing. This dude has a whole bunch of money, and he's gonna have a pound bro, a pound. And it's gonna be fire - fire. So, . . . . blood, can you come through . . . ? And if the lick (unintelligible) I'll give you half or a quarter of it . . . ."

11

if the statement has been admitted under Evidence Code section 1223." (CALCRIM No. 418 (Aug. 2016 rev.) (2022 ed.) pp. 186–187, citing *People v. Jeffery* (1995) 37 Cal.App.4th 209, 215 and *People v. Herrera* (2000) 83 Cal.App.4th 46, 63.) If a court instructs a jury with CALCRIM No. 418, it must also give either CALCRIM No. 415 (Conspiracy) or CALCRIM No. 416. (See Bench Notes to CALCRIM No. 418.) Whereas Samoata relies on this Bench Notes guidance for his position that the court was obligated to sua sponte instruct the jury on conspiracy and use of a coconspirator's statements, the People contend neither of the cases cited in the Bench Notes (*Jeffery* and *Herrera*) stand for such a proposition.

We do not need to resolve this aspect of the parties' dispute. In March 2023—after Samoata filed his opening brief, but before the People's respondent's brief and Samoata's reply brief were filed—the Bench Notes accompanying CALCRIM No. 418 were revised. They now state: "It is *an open question* whether the court has a **sua sponte** duty to instruct on the use of a coconspirator's statement to incriminate a defendant. (See *People v. Prieto* (2003) 30 Cal.4th 226, 251–252 [(*Prieto*)]; *People v. Sully* (1991) 53 Cal.3d 1195, 1231–1232 [(*Sully*)].) On request, the court must give this instruction if the statement has been admitted under Evidence Code section 1223." (Bench Notes to CALCRIM No. 418 (Mar. 2023 rev.), italics added.) Neither side has argued the guidance from the revised Bench Notes is an inaccurate statement of the law.

The parties also dispute whether a duty to instruct was triggered in this case. Samoata contends it was because the trial court admitted the Instagram and Snapchat messages sent from Noah's account under Evidence Code section 1223. The People contend no such duty arose because the court

12

did not admit the messages under the coconspirator exception to the hearsay rule. Rather, it admitted them as nonhearsay.

The People are correct that the trial court admitted the messages as nonhearsay. But this does not necessarily compel the conclusion that instructions on conspiracy and use of a coconspirator's statements were not required. " ' " 'It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence' " and " 'necessary for the jury's understanding of the case.' " ' " (*People v. Molano* (2019) 7 Cal.5th 620, 667.) In ruling the messages were admissible, the court reasoned, in part, that they were circumstantial evidence of a conspiracy to rob. The relevance and the nonhearsay purpose for which the messages were offered thus depended on the existence of a conspiracy between Samoata and his brother.

The current Bench Notes to CALCRIM No. 418 state there may be "a **sua sponte** duty *to instruct on the use of a coconspirator's statement to incriminate a defendant.*" (Bench Notes to CALCRIM No. 418 (Mar. 2023 rev.), italics added.) The quoted language does not reference Evidence Code section 1223 or confine the possible sua sponte instructional duty to cases involving this hearsay exception. Here, although it was established at trial that certain Instagram and Snapchat messages originating from Noah's account were sent by Samoata, there was also evidence some of them were sent by Noah. Although the messages were used to prove facts other than the matters asserted within them, it is still the case that "a coconspirator's statement" was used "to incriminate" Samoata. (See Bench Notes to CALCRIM No. 418 (Mar. 2023 rev.).) Taken to their logical conclusion, the revised Bench Notes to CALCRIM No. 418 suggest it is an "open question"

13

whether a sua sponte duty to give CALCRIM No. 418 (and with it, CALCRIM No. 416) exists in a case such as this.

Ultimately we find it unnecessary to answer this question. In *Sully* and *Prieto*, the California Supreme Court assumed without deciding that the trial court had a sua sponte duty to instruct the jury on the definition of an uncharged conspiracy and the requirements for admissibility of a coconspirator's statements where such statements were admitted at trial pursuant to Evidence Code section 1223. (*Sully*, *supra*, 53 Cal.3d at p. 1231; *Prieto*, *supra*, 30 Cal.4th at p. 251.) We take the same approach here. That is, even if we " '[a]ssum[e] the court had a sua sponte duty to so instruct the jury under these circumstances,' the error was harmless." (*Prieto*, at p. 251, quoting *Sully*, at p. 1231.)

The failure to instruct jurors regarding coconspirator statements is governed by the state law harmless error standard and is deemed harmless unless it is reasonably probable that a result more favorable to the defendant would have been achieved in the absence of the error. (*Prieto*, *supra*, 30 Cal.4th at pp. 251–252; *Sully*, *supra*, 53 Cal.3d at pp. 1231–1232; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) The defendant bears the burden of demonstrating prejudice under this standard. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 201.)

Samoata fails to carry his burden of showing there is a reasonable probability instructing the jury with CALCRIM Nos. 416 and 418 would have improved his results at trial. This is his theory of prejudice: The Instagram and Snapchat messages influenced the jury's determination whether he intended to commit a robbery at the time of the shooting, which in turn

14

affected its decision as to whether the homicide of Briseno constituted felony murder.[10]

Samoata's prejudice arguments suffer from two fundamental flaws. First, he broadly characterizes all of the messages sent from Noah's Instagram and Snapchat accounts as "text and video evidence from Noah," "Noah's . . . messages," and "Noah's conduct and statements." He asserts "the arrangements [with Erik] were made by Noah sending messages over social media." These are not accurate characterizations of the evidence. Contrary to Samoata's apparent effort to portray all of the Instagram and Snapchat messages as statements of Noah, Samoata testified at trial that he sometimes used Noah's Instagram and Snapchat accounts, and he specifically used them in this case to communicate with Erik. Samoata admitted *he* located Erik on Instagram; *he* used Noah's account to send Erik messages through Instagram; and *he* entered into an agreement via these messages for Erik to sell him a pound of "weed" in exchange for $1500. Samoata further testified it was his voice in the Snapchat audio messages asking Erik if he wanted to buy a "strap," and that he sent these messages to confirm Erik would not be armed. Samoata also admitted he and Noah were the two people shown in the Snapchat videos sent from Noah's account. To the extent these videos recorded Samoata's verbal and nonverbal expressions, the expressions were his own, not his brother's. The imprecision with which Samoata

---

[10] The jury was instructed on first degree willful, deliberate, and premeditated murder; first degree robbery murder (and, correspondingly, the elements of robbery); justifiable homicide committed in self-defense; and voluntary manslaughter arising from imperfect self-defense. It was also instructed on attempted murder and attempted voluntary manslaughter arising from imperfect self-defense.

15

characterizes the trial record undermines the persuasive value of his prejudice arguments.

Second, and more importantly, Samoata does not meet his burden of affirmatively establishing that instructing the jury with CALCRIM Nos. 416 and 418 likely would have made a difference in the outcome of the trial. He merely argues that "[i]f properly instructed on uncharged conspiracy and how to consider coconspirator statements, *the jury may well have found* that the prosecution failed to establish by a preponderance of the evidence that either [(1)] a conspiracy between Noah and [Samoata] existed or that [(2) Samoata] was a member of any conspiracy when Noah was sending texts about guns or doing a 'lick.' " (Italics added.) He does not support this assertion with a citation to legal authority, and he does not develop the argument further. Samoata's bare assertion about what the jury "may" have found raises only an abstract possibility of prejudice. Arguments that raise only an abstract possibility of prejudice do not satisfy the *Watson* standard. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

Having reviewed the record, we also do not agree with Samoata's assertion that a jury, instructed with CALCRIM Nos. 416 and 418, would have found insufficient evidence that "a conspiracy between Noah and [Samoata] existed." The evidence of a conspiracy between Noah and Samoata was strong. Samoata admitted he found Erik on Instagram by searching for terms like "plugs" or "weed,"[11] that he messaged Erik because he was trying to "[s]cam [Erik] with fake money to get a pound of weed," and that he personally procured the fake money that was to be used to pull off the scheme. Samoata testified he became involved after Noah asked him to "do

---

[11]   As Erik explained, a "plug" means "someone who has weed."

the deal" because Noah was scared. Samoata specifically admitted sending Erik the message, "Yo, you want to buy a strap," and that his purpose in doing so was to see if Erik would be armed. He acknowledged that asking if the victim wanted to buy a gun was "something [Samoata] . . . or [Noah] would do when . . . trying to do these setups." He admitted that when Erik arrived in San Diego, Samoata was "outside to do the setup" while Noah was communicating with Erik. Samoata's testimony alone amply proved a conspiracy between him and Noah existed. (See CALCRIM No. 416 ["An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime."].)

We also do not agree with Samoata's claim the jury would have found insufficient evidence that "[Samoata] was a member of any conspiracy" *when* the messages about guns or doing a "lick" were sent. (See CALCRIM No. 418 [People must establish that "[t]he statement was made before or during the time that [the defendant was] participating in the conspiracy"].) The message to "Kenneth" about a "lick" was sent on the afternoon of November 4, and the videos showing Noah and Samoata with guns were sent to "Eli" on November 5. These communications were all sent after November 3, when Samoata sent his first Instagram message to Erik. Samoata testified he sent messages to Erik in order to "[s]cam him with fake money to get a pound of weed," and he became involved in doing the deal with Erik at Noah's behest. The messages about guns or a "lick" all postdated the point when Samoata first became involved in the scheme.

Samoata's other prejudice arguments are similarly unavailing. He observes that in closing arguments to the jury, his trial counsel argued no robbery was committed because Briseno handed Samoata the backpack with the marijuana before Samoata began shooting. He points out that the jury

17

sent a note asking whether the backpack changed possession when Briseno handed it to Samoata, and contends the jury's note shows it was focused on whether a robbery, and therefore a robbery-murder, occurred. The difficulty with this argument is that the social media messages had no bearing on the jury's determination of whether Briseno gave Samoata the backpack before the shooting. In Samoata's version of the events, it was Briseno who handed the backpack over, making it Briseno's decision whether to do so. The Instagram and Snapchat messages sent from Noah's account were sent by Samoata and Noah. The messages reflected *their* intentions, not the mindset of Briseno.

Finally, Samoata contends the prosecutor "leaned heavily" on the Instagram and Snapchat messages in her closing arguments to the jury "to prove theories of both premeditated and robbery-felony murder." But because Samoata does not establish there is a reasonable likelihood the jury would have declined to consider any of the messages had it been instructed with CALCRIM Nos. 416 and 418, this contention fails. To the extent that Samoata complains the prosecutor told the jury the messages showed a "plan" or "conspiracy to rob," whereas his own counsel told the jury Samoata's intent was "to 'scam,'" it is apparent from the record the real dispute at trial was not whether a conspiracy existed, but whether its object was to "rob" or to "scam" the victims. The jury was instructed on the legal definition of robbery pursuant to CALCRIM No. 1600. It was also instructed pursuant to CALCRIM No. 200 that it was required to follow the court's instructions rather than the attorneys' comments on the law. We presume that in deciding whether Samoata intended to commit a robbery that "the jury followed the instructions notwithstanding the prosecution's arguments." (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 62; *People v. Osband* (1996) 13

Cal.4th 622, 717 [courts of review " 'presume that jurors treat the court's instructions as a statement of law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade' "].)

## II.

### *Samoata Is Entitled to a Remand for Resentencing*

In a bifurcated proceeding, the jury found the following aggravating sentencing factors to be true: (1) the offense involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; and (2) Samoata was armed with or used a handgun during the commission of "the offense." The trial court sentenced Samoata to 25 years to life for the first degree murder of Briseno (count 1) and 25 years to life for the associated section 12022.53, subdivision (d), firearm enhancement. On the attempted voluntary manslaughter of Erik (count 2), the court imposed the middle term of three years plus the middle term of four years for the section 12022.5, subdivision (a), firearm enhancement, and the mandatory three years for the section 12022.7, subdivision (a), great bodily injury enhancement. All terms were run consecutively, making Samoata's total sentence 60 years to life.

Samoata seeks a remand for resentencing on two claims of error. First, he contends the trial court, in imposing sentence, failed to recognize or to exercise its discretion under section 1385, subdivision (c)(2), to strike any or all of the enhancements, or under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) to substitute his firearm enhancement under section 12022.53, subdivision (d), with a lesser included firearm enhancement in subdivisions (b) or (c) of section 12022.53 or subdivision (a) of section 12022.5.[12] Second,

---

[12] Section 12022.53 provides a consecutive sentence of 10, 20, or 25 years to life for violations of subdivisions (b), (c), and (d), respectively. (§ 12022.53,

19

he contends the court failed to determine his ability to pay pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164; alternatively, his counsel was ineffective for failing to object to the imposition of fines and fees without a *Dueñas* hearing.

In our prior opinion, we concluded Samoata failed to establish he was entitled to a remand for resentencing on any of these grounds. After we issued our opinion, the California Supreme Court decided *McDavid*, *supra*, 15 Cal.5th 1015, in which it held sentencing courts have discretion to substitute a section 12022.53 firearm enhancement with a lesser included enhancement under a law other than section 12022.53. (*McDavid*, at p. 1021.) Having reconsidered our decision, we now conclude Samoata is entitled to a remand for resentencing so the trial court can exercise its discretion under *McDavid*, making it unnecessary for us to address his other claims of sentencing error.

Relevant to this issue, Samoata claims the trial court did not understand at the time of his sentencing hearing that it had the discretion to substitute a lesser firearm enhancement for his section 12022.53, subdivision (d), enhancement. Specifically, he contends the court "appeared unaware" it had the discretion to substitute his charged and adjudicated section 12022.53, subdivision (d), enhancement with a lesser included enhancement from either subdivisions (b) or (c) of section 12022.53 or subdivision (a) of section 12022.5. Samoata's claim is based on the trial court's silence on the matter during the sentencing proceeding. The court imposed a 25-years-to-

---

subds. (b)–(d).) Section 12022.5 authorizes enhanced sentences for use of a firearm in the commission of *any* felony, unlike section 12022.53, which applies only to specified felonies. (See § 12022.5, subd. (a).) The sentences available under section 12022.5 are generally shorter than the sentences authorized by section 12022.53. (See § 12022.5, subd. (a) [providing for a term of imprisonment in state prison of three, four, or 10 years].)

life sentence for the section 12022.53, subdivision (d), enhancement without stating it had considered the possibility of substituting it with a lesser included firearm enhancement.

On a silent record such as this, we ordinarily presume the trial court is aware of its authority under the applicable law in existence at the time of the hearing. (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) Thus, in our prior opinion, we concluded the trial court was not unaware of its discretion to substitute Samoata's section 12022.53, subdivision (d), enhancement with a lesser included firearm enhancement, whether that enhancement was contained in subdivisions (b) or (c) of section 12022.53, or subdivision (a) of section 12022.5. We explained that in *Tirado*, *supra*, 12 Cal.5th 688, the California Supreme Court held that sentencing courts have discretion under section 12022.53 to strike or dismiss a section 12022.53, subdivision (d), enhancement and impose one of the lesser enhancements in subdivisions (b) or (c) of section 12022.53 even where, as here, the lesser enhancements were not charged in the information or found true by a jury. (See *Tirado*, at pp. 696, 700.) *Tirado* was decided in January 2022, more than two months before Samoata's sentencing hearing, which took place in April 2022. Based on this timing, we reasoned the court was presumably aware of *Tirado* and its potential implications at the time of sentencing.

Implicit in our reasoning was the belief that the trial court's presumed awareness of *Tirado* and its potential implications meant it was aware of all possible sentencing alternatives—both its discretion to substitute Samoata's section 12022.53, subdivision (d) enhancement with an uncharged firearm enhancement in section 12022.53, subdivisions (b) or (c), as well as its discretion to substitute the section 12022.53, subdivision (d), enhancement with a lesser included firearm enhancement from a statute other than section

21

12022.53, such as section 12022.5, subdivision (a). After *McDavid*, *supra*, 15 Cal.5th 1015, it is apparent this belief was not entirely correct. It was correct insofar as we concluded that based on *Tirado*, the court must have known of its discretion to substitute a section 12022.53, subdivision (d), enhancement with an uncharged section 12022.53, subdivision (b) or (c) enhancement; this much was established in *Tirado*. (See *Tirado*, *supra*, 12 Cal.5th at p. 700.)

However, it was incorrect insofar as we concluded, based on *Tirado*, that the trial court was *also* aware of its discretion to substitute a section 12022.53, subdivision (d), enhancement with a section 12022.5, subdivision (a), enhancement. As *McDavid* makes clear, the discretion to substitute a section 12022.53 enhancement with a lesser included firearm enhancement from a statute other than section 12022.53 is derived from judicial interpretation of different statutory text than the statutory text underlying the holding of *Tirado*. (See *McDavid*, *supra*, 15 Cal.5th at pp. 1029–1030 [explaining that *Tirado* relied on the first sentence of subdivision (j) of section 12022.53 as the provision authorizing the imposition of enhancements under section 12022.53, and stating "[w]e now hold that . . . *the second sentence* of subdivision (j) . . . does not bar the court from imposing a lesser included, uncharged enhancement under a law other than section 12022.53" (italics added)].) Therefore, the sentencing discretion identified in *McDavid* was not a potential implication of *Tirado*. In other words, we cannot presume from the fact *Tirado* was decided before Samoata's sentencing hearing that the trial court knew it had discretion to substitute a section 12022.53, subdivision (d) enhancement with an uncharged enhancement from section 12022.5, subdivision (a). Further, both *McDavid* and the intermediate appellate decisions holding this discretion existed (e.g., *People v. Johnson*

22

(2022) 83 Cal.App.5th 1074, 1085–1093*; People v. Fuller* (2022) 83 Cal.App.5th 394, 397) were decided after Samoata's sentencing hearing.

"Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court. A court which is unaware of the scope of its discretionary powers can no more exercise that informed discretion than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." (*People v. Salazar* (2023) 15 Cal.5th 416, 424 (*Salazar*) [cleaned up].) "In such circumstances, . . . the appropriate remedy is to remand for resentencing unless the record clearly indicates that the trial court would have reached the same conclusion even if it had been aware that it had such discretion." (*Ibid.* [cleaned up].)

In a supplemental response brief, the People do not dispute the trial court was unaware of its discretion under *McDavid* at the time of Samoata's sentencing hearing.[13] They contend, however, that a remand for resentencing is not required. They observe that the trial court elected not to strike the four-year enhancement attached to count 2 or to replace the 25-years-to-life firearm enhancement attached to count 1 with a 20-year

---

[13] Pursuant to California Rules of Court 8.200(b)(1), Samoata filed a supplemental opening brief and the People a supplemental response brief. In their supplemental response brief, the People have not renewed their previously advanced argument that Samoata forfeited his claim of error by failing to raise it at the time of sentencing. We agree with the People's implicit concession the forfeiture doctrine does not apply here. A sentencing court's failure to exercise informed discretion is among the classes of error that can be reviewed even in the absence of a timely objection. (*People v. Downey* (2000) 82 Cal.App.4th 899, 912; *People v. Leon* (2016) 243 Cal.App.4th 1003, 1023.) Even if the forfeiture doctrine applied, we would exercise our discretion to address the claim in the interests of justice.

enhancement under section 12022.53, subdivision (c). They argue this clearly indicates the court would have made the same sentencing decision on the section 12022.53, subdivision (d), enhancement even if it had been aware of its discretion under *McDavid* to impose one of the lesser enhancements from section 12022.5, subdivision (a).

Although the People's argument has intuitive appeal, *Salazar* does not support it. In *Salazar*, our high court repeatedly emphasized that when a sentencing court is unaware of its discretion, the appropriate course is to remand for resentencing unless the record clearly indicates the sentencing court would have imposed the same sentence had it known of the full scope of its discretionary authority. (*Salazar*, *supra*, 15 Cal.5th at pp. 424, 425, 431, 432.) The Court stated: "When the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing. Mere reliance on the length of the original sentence and attendant decisions, such as imposing consecutive sentences, imposing middle or upper term sentences, or declining to strike enhancements, is not sufficient to provide a clear indication of what a sentencing court might do on remand if it had been fully aware of the scope of its discretionary powers." (*Salazar*, at p. 431.)

The trial court's decision in this case not to strike the four-year firearm enhancement attached to count 2 is precisely the kind of attendant sentencing decision identified in *Salazar* as insufficient to provide the clear indication of intent required to avoid a remand. (See *Salazar*, *supra*, 15 Cal.5th at p. 431.) And although we presume, given the trial court's silence on the topic, that it considered whether to replace Samoata's 25-years-to-life

24

firearm enhancement under section 12022.53, subdivision (d) with a 20-year enhancement under section 12022.53, subdivision (c) and elected not to do so, we are not convinced this constitutes the sort of clear indication of intent required by *Salazar*. When the court made its decision, it was unaware of the full panoply of sentencing options available under section 12022.53. On this silent record, we cannot rule out the possibility the court would have approached its decision differently had it known of the full range of sentencing alternatives available for Samoata's charged and adjudicated section 12022.53, subdivision (d) enhancement. We therefore disagree the record provides the clarity necessary for us to find a remand would be futile.

Consequently, we conclude the appropriate remedy is to vacate Samoata's sentence and remand the matter for resentencing to allow the trial court to exercise its discretion under section 12022.53 and *McDavid* in the first instance. We express no opinion on the outcome of the court's exercise of this discretion.[14]

---

14    On July 22, 2024, Samoata filed a motion for leave to file a second supplemental opening brief in which he argues that a recent decision of this court (*People v. Gonzalez* (2024) 103 Cal.App.5th 215), shows the trial court was unaware of the scope of its discretion under section 1385, subdivision (c). We deny the motion. It is untimely under California Rules of Court, rule 8.200(b)(1), and it is rendered moot by our decision to vacate his sentence and remand the matter for resentencing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893; see *People v. Walker* (2021) 67 Cal.App.5th 198, 206 ["a criminal sentence is, like an atom, indivisible" such that "[t]he invalidity of one component infects the entire scheme," obligating the resentencing court to consider pertinent circumstances that have arisen since the prior sentence was imposed].) Samoata may raise his argument with the trial court.

## DISPOSITION

The sentence is vacated, and the case is remanded for full resentencing, including for the exercise of the trial court's discretion under *McDavid*. The judgment is affirmed in all other respects.


DO, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.